**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PAUL REINSMITH and KEVIN )
DINSDALE, Individually, and on Behalf of )
All Others Similarly Situated, )
  )
  Plaintiffs, )
  ) Case No. 05-11168 GAO
  v. )
  )
CASTLE POINT MORTGAGE, INC., )
  )
  Defendant. )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR A TEMPORARY RESTRAINING AND OTHER RELIEF**

**Erik H. Langeland**
**BBO # 567388**
**730 Fifth Avenue, 9th Floor**
**New York, NY 10016**
**(212) 659-7774**
**(212) 898-9086 (Fax)**
**Erik.h.langeland@rcn.com**

# TABLE OF CONTENTS

Table of Authorities ……………………………………………………… i-iii

Issue Presented……………………………………………………………… 1

Facts………………………………………………………………………………1

Legal Argument…………………………………………………………………4

    A.  Injunctive Relief Standard…………………………………………………..4

    B.  Plaintiffs Likelihood Of Success On The Merits……………………….......5

        1.  Plaintiffs' Overtime Claim………………………………………….5

        2.  Retaliation…………………………………………………………..8

    C.  Plaintiffs Have Suffered—And Will Continue To Suffer—Irreparable
        Harm From Castle Point's Retaliation And Improper communications……14

    D.  Plaintiffs Suffer Significant Hardship In The Absence Of A Preliminary
        Injunction Whereas Defendant Faces Virtually None………………………18

    E.  The Public Interest Weighs In Favor Of Granting Plaintiffs A Preliminary
        Injunction…………………………………………………………………19

Conclusion…………………………………………………………………20

## TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Mt. Clemens Pottery Co.*
  328 U.S. 680, 687-688 (1946) 6

*Arnold v. Ben Kanowsky, Inc.,*
  361 U.S. 388 (1960) 7

*Auer v. Robbins,*
  519 U.S. 452, 462 (1997) 7

*Bailey v. Gulf Coast Transportation, Inc.,*
  280 F.3d 1333, 1336 (11th Cir. 2002) passim

*Belt v. Emcare,*
  299 F.Supp. 2d 664, 667 (E.D.Tex. 2003) 4

*Blackie v. Maine,*
  75 F.3d 716, 722 (1st Cir. 1996) 9

*Brock v. Casey Truck Sales, Inc.,*
  839 F.2d 872, 876-78 (2d Cir.1988) 12

*Burrus v. United Telephone Company of Kansas, Inc.,*
  683 F.2d 339, 333 (10th Cir. 1982) 12

*Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston, Et. Al.,*
  38 F.Supp 2d 46 5

*Corning Glass Works v. Brenman,*
  417 U.S. 188, 196-97 (1974) 7

*Haffer v. Temple Univ.,*
  115 F.R.D. 506 (E.D. Pa. 1987) 18

*Hayes v. McIntosh,*
  604 F.Supp. 10, 19 (N.D. Ind. 1984) 10

*Hipp v. Liberty National Ins. Co.,*
  252 F.3d 1208, 1216 (11th Cir. 2001) 18

*Holden v. Hardy,*

169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780                                              19

*Kanida v. Gulf Coast Medical Personnel, LP.,*
   363 F.3d 568 (5th Cir. 2004)                                                                  12

*Klein v. Rush-Presbyterian-Saint Luke's Medical Center,*
   990 F.2d 279, 283 (7th Cir., 1993)                                                            7

*Kleiner v. First National Bank of Atlanta,*
   751 F.2d 1193, 1198 & 1202 (11th Cir. 1985)                                        4, 16, 18

*Marshall v. Seminole Distributors, Inc.*
   1977 WL 1681 *2 (N.D. Fla. 1977).                                                             9

*Martin v. Tony & Susan Alamo Found.,*
   952 F.2d 1050, 1052 (8th Cir. 1992)                                                           6

*Martinez v. Deaf Smith County Grain Processors, Inc.,*
   583 F.Supp. 1200, 1209                                                                9, 12, 13, 14

*Meek v. United States,*
   136 F.2d 679 (6th Cir. 1943)                                                                  9

*Mitchell v. Robert De Mario Jewelry,*
   361 U.S. 288, 292 (1960)                                                              15, 16, 19

*Recinos-Recinos, et al v. Express Forestry, et al,*
   2006 U.S. Dist. LEXIS 2510, *39 (E.Dist.La January 23, 2006).                 17

*Skidmore v. Swift,*
   323 U.S. 134, 140 (1944)                                                                      8

*Tennessee Coal, Iron & R. Co. v. Musoda Local No. 123,*
   321 U.S. 590, 597 (1944)                                                                     19

*Valerio v. Putnam Associates,*
   173 F.3d 35, 43 (1st Cir. 1999)                                                              16

**Federal Statutes**

29 U.S.C. § 216(b)                                                                             18, 19

29 U.S.C. § 207                                                                                     6

29 U.S.C. § 215(a)(3)                                                                          1, 9, 17

29 U.S.C. § 216(b)                                                                                  5

29 U.S.C. §215(a)(3)                                            5, 10

29 U.S.C. §216(b)                                              5

29 U.S.C. §217                                                 5

**Federal Rules**

FRCP 65                                                        5

**Federal Regulations**

29 C.F.R. Part 541                                            7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PAUL REINSMITH and KEVIN   )
DINSDALE, Individually, and on Behalf of )
All Others Similarly Situated,   )
            )
     Plaintiffs,   )
            ) Case No. 05-11168 GAO
   v.       )
            )
CASTLE POINT MORTGAGE, INC.,  )
            )
     Defendant.  )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND OTHER RELIEF**

**ISSUE PRESENTED**

Section 215(a)(3) of the Fair Labor Standards Act prohibits retaliation against former employees who file a complaint for overtime under the Act. Defendant has now sued at least six plaintiffs in this case—nearly one third of those who joined—only asserting these claims after former employees opted into this overtime lawsuit. Should Defendant's state-law claims be enjoined as they retaliate against these plaintiffs and intimidate others who are considering joining this action?

**FACTS**

On June 6, 2005, Kevin Dinsdale and Paul Reinsmith, former Castle Point loan officers, filed a collective action complaint against Castle Point seeking monetary damages and other relief provided under the Fair Labor Standards Act (FLSA) for Castle Point's widespread failure to pay overtime. Castle Point deliberately classified its loan officers as exempt from overtime even in the face of two Department of Labor (DOL) Opinion Letters directly on point which concluded that loan officers were not exempt. Exhibit A.

On July 12, 2005, Castle Point filed an answer and simultaneously brought state-law counterclaims against Dinsdale and Reinsmith for their alleged breach of a non-compete agreement so vast in geographic scope as to be enforceable on its face. Exhibit B. Castle Point never suggested Plaintiffs violated any such agreement until immediately after it was sued in this case. Dinsdale and Reinsmith moved to dismiss Castle Point's claims on August 1, 2005 in this Court. Exhibit C.

Castle Point later filed three additional counterclaims against former employees—Charles Smith, Amanda Raffenello, and Eric Jensen— all of whom had likewise recently joined this action. Exhibit D. Dinsdale and Reinsmith moved to dismiss each of these counterclaims. In their last motion—after Castle Point had countersued nearly one-third of the class—Dinsdale and Reinsmith asserted that this Court should dismiss Castle Point's counterclaims because they were prohibited by the anti-retaliation provisions of the FLSA. Exhibit E.

Confronted with Plaintiffs' motion seeking dismissal based upon Castle Point's retaliatory conduct, Castle Point abruptly dismissed all of its counterclaims on January 6, 2006. Exhibit F. This Court, therefore, did not have to rule upon Dinsdale's and Reinsmith's motion to dismiss on the basis of retaliation at that time.

On the same day it dismissed its federal counterclaims, however, Castle Point filed state actions against Dinsdale[1], Reinsmith[2], and Raffenello[3] for the identical causes of action it had raised in its counterclaims. Exhibit G. Upon information and belief, Castle Point also filed an action against Smith on that date and intended to file an action against Jensen. Jensen, however, decided to withdraw his overtime claim against Castle

---

[1] Castle Point Mortgage, Inc. vs. Kevin Dinsdale, Civil Action No.: 06-0052, Middlesex Superior Court.
[2] Castle Point Mortgage, Inc. vs. Paul Reinsmith, Civil Action No.: 06-0065, Suffolk Superior Court.
[3] Castle Point Mortgage, Inc. vs. Amanda Raffenello, Civil Action No.: 06-18B, Essex Superior Court.

Point in exchange for Castle Point's release of its claims against him.  Jensen withdrew from this action, despite having a meritorious and substantial claim for more than approximately fifteen months of unpaid overtime.  Castle Point's scheme to punish anyone who joined this action continued even after this Court authorized notice of this lawsuit to be mailed.  For example, Castle Point filed a state-law claim against Nichol Hannaford one week after this Court authorized notice to be issued.[4]  Exhibit H. Hannaford responded by withdrawing from this action out of fear of having to defend herself against Defendant's state-law claim.  Like Jensen, she has done so despite having a meritorious claim for overtime pay for one year.

Castle Point's sudden purported need to assert its "constitutional rights" by filing its lawsuit has only become necessary since the filing of this lawsuit.  Before that time, it had not sued any of its former employees for allegedly breaching its non-compete agreement.  Castle Point's message is all too clear: it will sue anyone who asserts his or her rights to overtime.

On February 9, 2006, this Court authorized notice to be sent to 254 current and former loan officers to inform them of this lawsuit.  The parties went to great lengths to agree upon the language and content of the notice.  Significantly, Castle Point's lawyers demanded that Plaintiffs' counsel agree to not contact prospective class members.  The reason for Castle Point's request is now clear.  While silencing Plaintiff counsel's communications with prospective class members, the Defendant at the same time was preparing to implement its own scheme to covertly communicate with these same persons and actively discourage their participation.  Affidavit of Jason Lewis ("Exhibit I") ¶¶6, 12.

---

[4] Castle Point Mortgage, Inc. vs. Nichol C. Hannaford, Civil Action No.: 06-260C, Essex Superior Court.

Among other things, Castle Point required prospective members of this class, without notice to Plaintiffs' counsel or this Court, to attend meetings in which it: 1) misled them about the facts and merits of this case; 2) discouraged them from joining; and, 3) made clear that it would immediately take adverse action against anyone who joined. Exhibit I ¶¶6-12. Those who attended the meetings were understandably afraid that Castle Point would terminate or take adverse employment action against them if they asserted their rights by joining this lawsuit. Castle Point's improper communications with its captive audience have been very effective. Despite two mailings, **out of the 254 people who were sent notices, only seven (less than 3%) have even inquired about this case.** Courts have consistently held that a low response rate is strong evidence of coercion by the defendant. *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1198 & 1202 (11th Cir. 1985) (2,800 of 3,000 eligible class members contacted by the defendant refused to participate).

Castle Point's state-law actions and unauthorized direct communications with potential class members are calculated only to punish those who have joined this lawsuit and deter others from joining. As Castle Point's conduct flagrantly undermines this Court's authority to "manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands … ,"[5] Plaintiffs bring this Motion.

## LEGAL ARGUMENT

### A. INJUNCTIVE RELIEF STANDARD

The traditional criteria for granting a preliminary injunction consist of four elements: (1) whether the plaintiff has shown a likelihood of success on the merits; (2)

---

[5] *Belt v. Emcare*, 299 F.Supp. 2d 664, 667 (E.D.Tex. 2003).

whether the plaintiff has shown an imminent threat of irreparable harm in the absence of the preliminary injunction; (3) the balance of hardship to the plaintiff if the injunction is not issued against the hardship to the defendant if the requested injunction is issued; and, (4) the effect of the proposed injunction on the public interest. *Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston, Et. Al.*, 38 F.Supp 2d 46, 13-14, U.S. Dist Ct (1st Cir 1999); *see also* FRCP 65. Notably, the Court of Appeals for the First Circuit often repeats that "the [plaintiff's] likelihood of success on the merits is of primary importance." *Id.*

In addition, 29 U.S.C. § 216(b) provides that upon an employer's violation of 29 U.S.C. §215(a)(3), that employer shall be liable "for such legal or equitable relief as may be appropriate to effectuate the purposes" of the anti-discrimination provisions of 29 U.S.C. §215(a)(3). Accordingly, individuals may seek injunctive relief under 29 U.S.C. §216(b) in conjunction with 29 U.S.C. §217, to enjoin an employer's discriminatory or retaliatory action based upon the employee's filing of a claim under the FLSA. *See, e.g., Bailey v. Gulf Coast Transportation, Inc.*, 280 F.3d 1333, 1336 (11th Cir. 2002) (issuing a preliminary injunction to halt prohibited intimidation of potential class by the employer.).

**B. PLAINTIFFS' LIKELIHOOD OF SUCCESS ON THE MERITS**

**1. Plaintiffs' Overtime Claim**

Plaintiffs have a strong likelihood of success on their overtime claims because: 1) they worked overtime during the statutory period; 2) they were not paid for their overtime; and, 3) Castle Point cannot prove that an exemption exists to the FLSA regulations that encompasses loan officers. The FLSA provides that employers must compensate employees for any hours worked in excess of 40 per week at a rate of no less

than one and one-half times their regular rate of pay.  29 U.S.C. § 207.  There are narrow

exceptions (known as "exemptions") to this general rule.  29 U.S.C. § 207.  In this

lawsuit, Plaintiffs bear the burden of proving only that they worked for Castle Point

during the statutory period for more than 40 hours a week and were not paid overtime

compensation.  Once proven, the burden shifts to the defendants to prove that its claimed

exemption for the employees in question was justified under the standards enunciated by

the Department of Labor.

There is little question that Plaintiffs will prevail on the question of whether they

worked overtime.  Plaintiffs and Castle Point's former managers verify the detailed

allegations in Plaintiffs' Complaint demonstrating they worked overtime.  Exhibit I ¶¶2,

5.  Castle Point, moreover, is unlikely to prevail on this issue.  Among other reasons,

Castle Point clearly failed to adequately record the actual hours that loan officers worked.

Where, like here, the employer's time records are inadequate or nonexistent, an employee

need only produce sufficient evidence to show the amount and extent of that work as a

matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.

680, 687-688 (1946).  When an employer has failed to keep proper records, courts should

not hesitate to award damages based on the "just and reasonable inference" from the

evidence presented.  *Martin v. Tony & Susan Alamo Found.*, 952 F.2d 1050, 1052 (8th

Cir. 1992).  Castle Point can only speculate as to the number of hours worked by

individual loan officers.  Even then, its inadequate records (which merely record some of

the times each loan officer logged in and out of their computers) establish loan officers

worked overtime.  Because of Castle Point's failure to comply with the FLSA record-

keeping requirements and its doomed after-the-fact attempt to manufacture such time

records, Plaintiffs have a strong likelihood of prevailing on their claims.

Castle Point's claim that its loan officers were exempt from the FLSA as they

were employed in bona fide administrative positions also fails.  It is crucial to note that

"employers bear the burden of proving the application of an exemption." *Klein v. Rush-*

*Presbyterian-Saint Luke's Medical Cent*er, 990 F.2d 279, 283 (7th Cir., 1993) (citing

*Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).  Moreover, "FLSA

exemptions are to be narrowly construed against...employers' and are to be withheld

except as to persons 'plainly and unmistakably within their terms and spirit.'" *Auer v.*

*Robbins*, 519 U.S. 452, 462 (1997) (citing *Arnold v. Ben Kanowsky*, Inc., 361 U.S. 388

(1960).

The administrative exemption applies only if the employee's primary duty is

office or non-manual work directly related to management policies or general business

operations of her employer or her employer's customers and the employee's work

requires the exercise of discretion and independent judgment. 29 C.F.R. Part 541.  The

Department of Labor ("DOL") has already directly and flatly rejected Castle Point's

claim that loan officers (like Plaintiffs) fall within the administrative exemption to the

FLSA.

Specifically, in two opinion letters, the DOL held that loan officers did not qualify

as bona fide administrative employees within the meaning of Section 541.2 of the

regulations.  Opinion Letter Fair Labor Standards Act, May 17, 1999,1999 WL 1002401;

Opinion Letter Fair Labor Standards Act, February 2001, 2001 WL 1558764.  In the

May, 1999 Opinion Letter, the DOL stated that loan officers were simply engaged in

carrying out the employer's day to day activities rather than determining the overall course and policies of the business. The DOL specifically reaffirmed the rationale of its 1999 decision in its 2001 Opinion Letter when it again concluded that loan officers were not exercising the necessary discretion and independent judgment within the meaning of the regulations, and consequently do not fall within the exemption for administrative employees. In both opinion letters, the DOL concluded that such loan officers are entitled to compensation in accordance with the overtime provisions of the FLSA. It is well-established that the "rulings, interpretations and opinions of the Administrator under [the FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift*, 323 U.S. 134, 140 (1944).

It is clear the Defendant misclassified its loan officers as exempt, required them to work extensive overtime hours to meet quotas, failed to properly record such overtime hours and refused to pay overtime compensation as required by the FLSA. The DOL opinion letters and witnesses also leave little doubt that the administrative exemption, as set forth by Castle Point, does not apply to the opt-in loan officers in this case. Accordingly, Castle Point will be unable to meet its burden of proving the inapplicability of the overtime regulations to the Plaintiff class. Plaintiffs are, therefore, likely to succeed on their claim.

### 2. Retaliation

The FLSA provides that it is unlawful for any employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this

chapter …" 29 U.S.C. § 215(a)(3).  To state a retaliation claim, Plaintiffs must show: (1) Plaintiffs engaged in a statutorily protected activity; (2) thereafter Plaintiff's employer subjected him or her to an adverse employment action; and, (3) the adverse action was a reprisal for having engaged in the protected activity. *Blackie v. Maine,* 75 F.3d 716, 722 (1st Cir. 1996).

There is no doubt that Plaintiffs engaged in protected activity by filing claims for overtime under the FLSA or opting in to this lawsuit.  *See, e.g. Blackie*, 75 F.3d at 723. After having engaged in this protected activity, however, Castle Point filed lawsuits against no less than six opt-in Plaintiffs.  Castle Point's lawsuits constitute adverse employment action taken in retaliation for Plaintiffs having filed FLSA claims. *See, e.g. Martinez v. Deaf Smith County Grain Processors, Inc.,* 583 F.Supp. 1200, 1209 (citing *Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731 (1983),  for the proposition that "[a] lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation.").

But Castle Point's harassing lawsuits are only one aspect of a comprehensive plan to threaten and intimidate potential class members.  Threats in and of themselves are considered "adverse employment action" and are prohibited by §215.  *See, e.g. Meek v. United States*, 136 F.2d 679 (6th Cir. 1943); *Marshall v. Seminole Distributors, Inc.* 1977 WL 1681 *2 (N.D. Fla. 1977).   In *Meek,* the Court of Appeals upheld a criminal conviction of a former employer for violating 29 U.S.C.A. §215(a)(3) based on facts that that the employer had told one of its employees that there was no use filing wage claims, and that if anyone did he would "fire every damn one of them." *Meek* 136 F.2d at 679. Similarly, the *Marshall* Court permanently enjoined defendant's threats, which it found

constituted unlawful discrimination. *Marshall* 199 WL 1681 at *2. Indeed, "a former employee is clearly protected against any type of harassment after employment has ended." *See Hayes v. McIntosh*, 604 F.Supp. 10, 19 (N.D. Ind. 1984). Here, Castle Point threatened to sue its former employees if they joined this lawsuit, has selectively carried out its promise and made that known to its employees, and has threatened to fire those who joined. Affidavit of Sarah Biehl ("Exhibit J") ¶¶6-8. ¶

Biehl states in her affidavit:

- I did not join because I was afraid that Castle Point would retaliate against me by either firing me or seeing to it that I did not receive any quality leads...(¶6);

- ...Castle Point, as a matter of policy, made it clear that it would retaliate against anyone who joint the Reinsmith lawsuit (¶6);

- Many of my fellow loan officers have informed me that they likewise received notices of this lawsuit but were afraid to join because they believed Castle Point would retaliate against them by firing them…(¶7);

- I was also afraid that Castle Point would retaliate against me by suing me if I joined the overtime lawsuit (¶8);

Lewis states in his affidavit:

- …Christopher Infantino and Steven Vanderbilt [Two of Castle Point's Owners] actively discouraged any of us from joining this lawsuit (¶7);

- Christopher Infantino then emphasized that Castle Point would use its superior financial position vis-à-vis its loan officers to make filing a lawsuit against it so prohibitively expensive that no former loan officer could realistically do so (¶10);

- During the course of my employment at Castle Point, I learned that former loan officers who had joined the Dinsdale and Reinsmith lawsuit were immediately countersued by Castle Point. Most of the other loan officers learned of these countersuits and as a consequence, became afraid of also being sued by Castle point in retaliation for joining the lawsuit (¶11);

Each of these actions alone constitutes adverse employment action. Taken together, they constitute compelling evidence of Castle Point's relentless effort to prevent its employees from having their rights to overtime adjudicated.

Both the Biehl and Lewis affidavit provide direct evidence of Castle Point's use of its lawsuits as a reprisal for participation in this litigation. Affidavit of Biehl ¶¶6, 8; Affidavit of Lewise ¶¶9, 10. Indeed, Castle Point's stated intention was to wreak economic havoc with any loan officer who asserts his legal rights against it. Exhibit I ¶¶9-10. The suspicious timing of Castle Point's claims and failure to bring lawsuits against dozens of other former loan officers who did not join this action clearly demonstrate its actions are nothing more than a pretext for its ulterior goal—namely, to dramatically limit its liability by harassing opt-ins and intimidating those who are eligible to participate. Although Castle Point had ample time, it did not see fit to sue any of the plaintiffs for their alleged violations until the decided to join this lawsuit:

| Plaintiff | Last Day with Castle Point | Date Joined Case | Sued By Castle Point |
|---|---|---|---|
| Kevin Dinsdale | December 1, 2003 | June 6, 2005 | July 12, 2005 |
| Paul Reinsmith | December 18, 2003 | June 6, 2005 | July 12, 2005 |
| Eric Jensen | April 1, 2005 | November 7, 2005 | November 28, 2005 |
| Charles Smith | May 25, 2005 | June 21, 2005 | August 10, 2005 |
| Amanda Raffenello | September 20, 2005 | November 9. 2005 | November 29, 2005 |
| Nichol Hannaford | April 15, 2005 | November 29, 2005 | February 16, 2005 |

For example, Castle Point did not sue Reinsmith or Dinsdale in the fifteen months before they filed this lawsuit, although their alleged wrongful activity had already occurred. Instead, Castle Point sued them one month after joining this lawsuit. Similarly, Castle Point did not sue Jensen in the seven months after his employment ended but sued him within three weeks of joining this case. Castle Point fired Smith on May 25, 2005 and then sued him less than two months after joining this case. Similarly,

Castle Point sued Raffenello within three weeks of joining this case. But Castle Point's retaliatory intent could not be more evident than in its lawsuit against Nichol Hannaford. There, Castle Point did not sue during the seven months before she joined this lawsuit. Instead, it sued her two and a half months after she joined—strategically timing the lawsuit to coincide with the exact date that the Court had authorized notice of this lawsuit to be sent to prospective class members. The fact that each of Defendant's claims was filed only *after* each Plaintiff asserted their FLSA claim is highly indicative of Defendant's retaliatory motive. *See Martinez,* 583 F.Supp. at 1210; *see, also, Burrus v. United Telephone Company of Kansas, Inc.*, 683 F.2d 339, 333 (10th Cir. 1982) (stating that in a Title VII case, a finding of a "causal connection" between "adverse action" by the employer and "protected activity" by the employee "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.").

Once Plaintiffs have established a prima facie case of retaliation—as they have done here—the burden shifts to Castle Point to produce evidence of a legitimate reason for the adverse employment action. *See, e.g. Kanida v. Gulf Coast Medical Personnel, LP.*, 363 F.3d 568 (5th Cir. 2004); *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876-78 (2d Cir.1988). Castle Point cannot seriously contend that it had anything other than a sinister and illegitimate motive for suing each of these former loan officer Plaintiffs. Its legal bills would easily exceed any potential verdict—or any potential recovery—from individual loan officers. Any explanation from Castle Point as to why it delayed bringing its state-law claims until this lawsuit was filed, is a ploy to cover its obvious financial interest in limiting this class by whatever means necessary.

Retaliatory conduct, like that occurring in this case, has properly been enjoined in other cases.  *See, e.g. Bailey* 280 F.3d at 1336-7; *Martinez* 583 F.Supp. at 1210-1212.  In *Bailey,* the Eleventh Circuit found that cab drivers who had been terminated because they had joined an FLSA action were entitled to a preliminary injunction.  In that case, the DOL filed an amicus brief supporting the position that preliminary injunctive relief was appropriate.  *See e.g., Bailey* 280 F.3d at 1336.  A preliminary injunction was particularly important in that case because there was evidence that other cab drivers were "fearful of participating in the suit." *Id.*  The defendant unsuccessfully argued that an injunction should not issue until the matter had gone to trial and it had been found to have retaliated against the plaintiffs.  *Id.* at 1337.  In rejecting defendant's position, the *Bailey* Court held that the purpose of the anti-retaliation provision was to protect employees who came forward with complaints.  *Id.*  Moreover, the *Bailey* Court recognized that employees would be "*less likely to stand up for their substantive rights under the statute if they know that months or years will pass before a court can act to half prohibited intimidation by their employer.*" *Id.* (emphasis added).

Here, Castle Point has retaliated against members of the case and instilled fear in others through its state-laws claims and disinformation campaign.  Exhibit J ¶¶6-8; Exhibit I ¶11.  It argues that plaintiffs cannot prove, without a trail, that it has retaliated. As in *Bailey,* Castle Point seeks to impose the expense and burden of a trial on the plaintiffs, knowing full-well its coercive effect on this case.  *See, e.g. Bailey* 280 F.3d at 1337.  As in *Bailey,* the plaintiffs and the prospective class should not have to wait years or months before Castle Point's actions are enjoined.

**C. PLAINTIFFS HAVE SUFFERED—AND WILL CONTINUE TO SUFFER—IRREPARABLE HARM FROM CASTLE POINT'S RETALIATION AND IMPROPER COMMUNICATIONS**

Castle Point's contamination of the potential class with fear of reprisal is so prolific that, absent an injunction and corrective notice, there is no doubt the vast majority will elect to forego their right to overtime.  It takes little imagination to recognize that a Castle Point employee would rather forego overtime pay than bear the severe economic hardship of defending even a baseless lawsuit brought by a wealthy corporation with comparatively unlimited resources.  "Regardless of how unmeritorious the employer's suit is, the employee will most likely have to retain counsel and incur substantial legal expenses to defend against it." *Martinez,* 583 F.Supp. at 1209 (citing *Bill Johnson's Restaurant's v. NLRB*, 461 U.S. 731 (1983)) (interpreting a clause in the National Labor Relations Act, which as explained in *Martinez*, is virtually identical to 29 U.S.C. § 215(a)(3) of the Fair Labor Standards Act).

Those plaintiffs who Castle Point has already sued now face the daunting prospect of defending Castle Point's illegitimate state-law claims.  Though meritless, defending these claims will undoubtedly consume a significant amount of time and Plaintiff's limited financial resources. The cost of defending these actions could easily exceed the individual loan officer overtime payments from this lawsuit.   Castle Point is transparently attempting to strong arm these loan officers into dropping their overtime lawsuit in exchange for dismissal of its state law actions against them.

At least six class members face this irreparable harm at this very moment.  Jensen dropped out of this lawsuit in exchange for a release of Castle Point's claims against him. He did so despite having a meritorious claim for overtime for 15 months.  His claim for

overtime has been dismissed with prejudice.  Obviously, the threat to him is irreparable.

Hannaford has also dropped out of this lawsuit despite having a meritorious claim for a

year of overtime pay.  Her overtime claims are likewise gone forever.

But the irreparable harm inflicted as a result of Castle Point's actions impacts a

far greater number of persons than those it has sued.  Castle Point's claims are calculated

to instill fear in those who might otherwise join this lawsuit.  The Supreme Court warned

of this very fear: "fear of economic retaliation might often operate to induce aggrieved

employees to quietly accept substandard conditions." *Mitchell v. Robert De Mario*

*Jewelry*, 361 U.S. 288, 292 (1960).  Ms. Biehl—a loan officer until March 2006—

confirms that she and other Castle Point loan officers eligible to join this action are afraid

that if they join this lawsuit, Castle Point will either terminate or constructively discharge

them by limiting the quality of the leads directed they receive.  Exhibit J ¶¶6, 7.  While

Biehl and other Castle Point employees were aware of this lawsuit, they were too

frightened to join.  Exhibit J ¶¶6, 7.  In Biehl's case, Castle Point made good on its

threats by firing her shortly after she complained to her boss that she was working unpaid

overtime.  Exhibit J ¶¶4, 5.

The fear Castle Point has successfully instilled in its employees through its

campaign of misinformation and intimidation is itself a cause of irreparable harm.  For

each day Castle Point successfully coerces its employees into not joining, their overtime

claims correspondingly diminish until they are ultimately gone forever.  *See, e.g.,* 29

U.S.C. § 216(b); *Hipp v. Liberty National Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir.

2001).  As the potential class consists of lay people, the harsh effect of the statute of

limitations is unlikely to be clear. Regardless, once the statute has passed, the claims are

gone. This harm is occurring to the potential class at this very moment.

But Castle Point employees are harmed in a more fundamental manner, as—out

of fear—they are deprived of the opportunity to assert rights that Congress has afforded

them. This fear and intimidation defeats the purpose of the anti-retaliation provisions and

the Act itself:

> A narrow construction of the anti-retaliation provision could create an
> atmosphere of intimidation and defeat the Act's purpose in § 215(a)(3) of
> preventing employees' attempts to secure their rights under the Act from
> taking on the character of "a calculated risk." *Mitchell*, 361 U.S. at 293,
> 80 S.Ct. 332. Such circumstances would fail to "foster a climate in which
> compliance with the substantive provisions of the Act would be
> enhanced." *Id.* at 292, 80 S.Ct. 332. *Valerio v. Putnam Associates*, 173
> F.3d 35, 43 (1st Cir. 1999).

Clearly, potential opt-ins face the calculated risk of being sued in this case and

have thus far decided to forego any attempt to secure their rights.

Castle Point has also irreparably harmed Plaintiffs through its misleading and

coercive communication with potential members of this class. *See Kleiner v. First*

*National Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985) (damage from

unauthorized, one-sided and unilateral communications with the class sabotage the goal

of informed consent and "could well be irreparable."). Courts will limit communications

with absent class members "where the communications were misleading, coercive, or an

improper attempt to undermine [the Federal Rules] by encouraging class members not to

join the suit." *Belt*, 299 F.Supp2d at 667 (citations omitted).

Effectively obliterating the Court's role in this process and nullifying the purpose

of the authorized notice, Castle Point conducted mandatory meetings with its current loan

officers during which it discussed the merits of this case and actively discouraged them

from joining.  Exhibit I ¶¶6-12.  During those meetings, plaintiffs' bosses made numerous false and misleading statements.  Exhibit I  ¶¶7-10  For example, Castle Point's owners falsely told prospective class members that the case had been brought by two "disgruntled" ex-employees for the purpose of "getting even" with Castle Point. Exhibit I ¶8.  Plaintiffs' bosses further misled their employees by advising them that the lawsuit was based on an "old" law that had been "twisted" for the wrongful purposes of the disgruntled employees.  *Id.*  Not surprisingly, no one mentioned Castle Point's enormous financial stake in this case or that its liability to the class is potentially in the many millions of dollars.  Exhibit I ¶9.

Castle Point's improper communications also included "promises"  that it would vigorously oppose any actions against, no matter how meritorious, because of its opinion that people had taken advantage of Castle Point's self-described good nature.  Exhibit I ¶10.  The Defendant has certainly fulfilled its promise by suing individuals who joined this action.  This conduct, along with its impermissible contact and other coercive actions, have so contaminated the environment that literally hundreds of potential plaintiffs are now afraid to opt-in. Exhibit I ¶11; Exhibit J ¶7.  Of course, Castle Point's unauthorized communication with the class has already occurred.  Thus, there is no way to "un-ring" the bell.  Castle Point's covert meetings and communication regarding this lawsuit, moreover, directly violate this Court's Order regarding issuance of notice and its inherent power to oversee communication with prospective class members.

Especially where, as here, there is an ongoing business relationship between defendant and plaintiffs, courts will not hesitate to find any communications about pending litigation "inherently coercive."  *Recinos-Recinos, et al v. Express Forestry, et*

*al,* 2006 U.S. Dist. LEXIS 2510, *39 (E.Dist.La January 23, 2006). Where such communication has indisputably taken place, "the court need not make a finding that a particular abuse occurred" before entering a protective order prohibiting any further communications. *Id.* The rationale is that it is "difficult to conceive of any advice from [defendant] regarding the lawsuit that is not rife with potential for confusion and abuse given defendants' interest in th[e] lawsuit." *Id.*; See *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1202 (11th Cir. 1985); *Haffer v. Temple Univ.,* 115 F.R.D. 506 (E.D. Pa. 1987). Because Castle Point' retaliatory state-law claims, improper communication, and intimidation continue to cause irreparable harm, plaintiffs and potential class members are entitled to a preliminary injunction. *See, e.g., Bailey,* 280 F.3d at 1336.

### D. PLAINTIFFS SUFFER SIGNIFICANT HARDSHIP IN THE ABSENCE OF A PRELIMINARY INJUNCTION WHEREAS DEFENDANT FACES VIRTUALLY NONE

Plaintiffs face the extreme hardship of having to defend Castle Point's state-law claims if Castle Point's lawsuits are not enjoined. Plaintiffs, moreover, must also overcome the fear that those lawsuits have instilled in the class. Those fears have been exacerbated by Castle Point's illicit communication with potential class members. Without an injunction, Castle Point will have succeeded in bullying potential class members to forego asserting their rights to overtime. An injunction and corrective notice are the only possible means by which to address the damage caused by the Defendant, protect the rights of absent class members and allow them to assert their rights.

Castle Point, in contrast, suffers virtually no harm from an injunction or protective order as its lawsuits would, at worst, be postponed until the resolution of this case.

Unlike potential class members, Castle Point's claims would not be affected by the statute of limitations, which is six years for contract actions such as Castle Point's. And Castle Point has no right to communicate with Plaintiffs about this litigation in any event.

## E. THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING PLAINTIFFS A PRELIMINARY INJUNCTION

The public has an overwhelming interest in ensuring that the provisions of the FLSA are upheld—as it is the public whose rights are at stake. *See, e.g., Mitchell,* 361 U.S. at 293. The purpose of the Act is "remedial and humanitarian." *Tennessee Coal, Iron & R. Co. v. Musoda Local No. 123,* 321 U.S. 590, 597; 64 S.Ct. 698, 99 L.Ed. 949 (1944); *Valerio,* 173 F.3d at 43. It, therefore, "must not be interpreted in a narrow, grudging manner." *Tennessee Coal,* 321 U.S. at 597. In *Mitchell,* the Supreme Court highlighted the importance of the ability of an employee to make a harassment-free complaint to the enforcement of the FLSA:

> The provisions of the statute affect weekly wage dealings between vast numbers of business establishments and employees. For weighty practical and other reasons, Congress did not seek to secure compliance with prescribed standards through continuing detailed federal supervision or inspection of payrolls. Rather it chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances. This ends the prohibition of s 15(a)(3) against discharges and other discriminatory practices was designed to serve. For it needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions. *Cf. Holden v. Hardy*, 169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780. *Mitchell at 292-293.*

Clearly, Congress, the Supreme Court, and the First Circuit recognize the important public interest in fostering an environment in which employees can join lawsuits to contesting their right to overtime pay. Castle Point's harassment and

intimidation of the potential class circumvents that process. If permitted to continue, it will only reward companies that intimidate their employees and will eviscerate the purpose of the FLSA.

## CONCLUSION

Plaintiffs therefore request that this Honorable Court:

1) enjoin Castle Point's state-law claims against Reinsmith, Dinsdale, Smith, Raffenello, and any other pending claims against any opt-ins;

2) enjoin Castle Point from bringing any claims against any other prospective class members;

3) enjoin Castle Point from terminating, discharging or taking any adverse employment action against any individuals for joining this lawsuit or providing testimony relative to it;

4) enjoin Castle Point from communicating about this lawsuit with any prospective class members;

5) enjoin Castle Point from "black-listing" or communicating with any class member's or potential class member's employer or future employer;

6) issue a corrective notice at Defendant's expense to all prospective class members;

7) increasing the amount of time prospective plaintiffs may join this action by an additional 60 days.

Dated: March 28, 2006                    Respectfully Submitted

                                        /s/ Erik H. Langeland
                                        Erik H. Langeland (BBO 567388)
                                        730 Fifth Avenue, 9th Floor
                                        New York, NY 10019
                                        (212) 659-7774
                                        ATTORNEY FOR PLAINTIFFS