UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAUL REINSMITH and KEVIN DINSDALE, Individually and on Behalf of all Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 05 11168 GAO |
| v. | ) | |
| | ) | |
| CASTLE POINT MORTGAGE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

CASTLE POINT MORTGAGE, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF

I.    INTRODUCTION

Disappointed in the number of current and former loan officers of defendant Castle Point Mortgage, Inc. that have thus far chosen to opt-in in to this collective action, plaintiffs refuse to acknowledge that there may simply be a lack of interest by class members in this action due to its lack of merit and the low level of overtime, if any, worked by most loan officers.  Instead, plaintiffs cast unsupported accusations of retaliation and coercion against Castle Point and its senior executives in an effort to lengthen the notice period beyond the 60-day period already established by this Court, send a third notice to potential class members, and interfere with Castle Point's constitutional right to petition the state court for redress of its claims.  As set forth more fully below, none of plaintiffs' requested relief is warranted.

II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Paul Reinsmith and Kevin Dinsdale, former Loan Officers of Castle Point, filed this complaint on June 6, 2005 alleging that Castle Point had violated the Fair Labor Standards Act, 29 U.S.C. § 207 by mis-classifying them as exempt employees and failing to pay them

overtime for hours worked in excess of forty hours per week. To date, 22 employees in addition

to the two named plaintiffs have opted into this lawsuit out of a potential class of approximately

245 current and former loan officers.

      A.      <u>The Federal Court Counterclaims and State Court Lawsuits</u>

      At the start of their employment with Castle Point, Reinsmith and Dinsdale each executed

Loan Officer Confidentiality, Non-Competition and Non-Solicitation Agreements

("Agreements"), attached as Exhibits A and B. Pursuant to the Agreements, Reinsmith and

Dinsdale agreed not to divulge confidential information of Castle Point, including customer lists

and referral source information, or to use such information for the benefit of third parties.

Agreements, ¶ 3. Reinsmith and Dinsdale also agreed that during their employment, and for a

one year period following the termination of their employment with Castle Point, they would not

contact or solicit, directly or indirectly, prospective, current or former clients, customers, referral

sources or employees of Castle Point other than for the benefit of Castle Point. Agreements, ¶ 5.

Lastly, Reinsmith and Dinsdale agreed that during their employment and for a six month period

following their employment, they would not compete with Castle Point and would not become

employed by any entity engaged in some or all of the same business as Castle Point in

Massachusetts. Agreements, ¶ 6.

      While still employed by Castle Point, Reinsmith violated his Agreement by soliciting

customers on behalf of First Call Mortgage, Inc., a Massachusetts-based competitor of Castle

Point. Reinsmith Complaint, attached as Exhibit G to Plaintiffs' Motion, ¶ 8. Reinsmith also

solicited at least one Castle Point employee to become an employee of First Call Mortgage while

still employed by Castle Point and/or within the year following the termination of his

employment with Castle Point. *Id.* at ¶ 9. In addition, immediately following the termination of

their employment with Castle Point, Reinsmith and Dinsdale began working as Loan Officers for First Call Mortgage in Massachusetts. *Id.* at ¶ 10; Dinsdale Complaint, attached as Exhibit G to Plaintiffs' Motion, ¶ 6.

Based on these facts, Castle Point filed counterclaims against Reinsmith and Dinsdale for breach of contract and intentional interference with advantageous relations. Plaintiffs moved to dismiss on grounds that the federal court lacked subject matter jurisdiction over Castle Point's counterclaims.

Over the next 10 months, 22 additional Loan Officers opted in to this lawsuit. Castle Point filed counterclaims against 3 of them based on facts similar to those present with Reinsmith and Dinsdale. For example, Amanda Raffenello who worked as a Loan Officer from approximately July 14, 2004, until September 20, 2005, in Castle Point's Andover, Massachusetts facility diverted information concerning potential customers of Castle Point to its competitor while still employed by Castle Point. Raffenello Counterclaim, ¶ 5. Eric Jensen solicited and/or received confidential business information of Castle Point concerning mortgage loan opportunities which he used for his own benefit and/or that of his new employer following the termination of his employment. Jensen Counterclaim, ¶ 5. In addition, Jensen began working for a competitor immediately following the termination of his employment with Castle Point. *Id.* at ¶ 4. Charles Smith also began working for a competitor following the termination of his employment with Castle Point. Smith Counterclaim, ¶ 4.

Plaintiffs moved to dismiss all counterclaims on the grounds that the federal court lacked subject matter jurisdiction over them. While Castle Point contended that the federal court did have subject matter jurisdiction, it voluntarily dismissed its counterclaims and re-filed four of them in state court to remove the jurisdictional issue as a point of controversy.

Two opt-in plaintiffs, both represented by counsel of record in this action, have executed mutual releases with Castle Point. A third, Shawn Driggers, requested that his consent to opt-in be struck. The settlement papers for Eric Jensen have been submitted to this Court and approved by this Court. The settlement papers for Nichol Hannaford have been submitted to the Court for approval. In none of these motions did plaintiffs' counsel raise any indication that the settlements or the motion to strike the opt-in consent were the result of coercion or intimidation.

B.    The Opt-In Notice

On February 17, 2006, this Court approved issuance by plaintiffs' counsel of two notices to potential class members concerning this lawsuit in a specified format and a 60-day opt-in period. The approved opt in notice explicitly states, in bold print, "No Retaliation Permitted" with an explanatory statement that "federal law prohibits Castle Point Mortgage, Inc. from discharging or in any other manner discriminating against you because you join this lawsuit." The notice sent by plaintiffs' counsel differs from that authorized by this Court in that it contains an 8.5" x 5" sheet of bright pink paper with "Opt-In Deadline Approaching April 18, 2006" written in large letters. Plaintiffs' counsel has also been hosting a web site since at least August, 2005, concerning this lawsuit, and sending e-mails concerning the lawsuit to attract opt-ins. *See* Ex. C; Affidavit of Christopher Infantino, ¶35.

C.    Castle Point's Communications with its Current Employees Concerning this Lawsuit.

1.    *July, 2005.*

Approximately every six months, Castle Point has a meeting with all managers to review ongoing business operations, future plans for the company and challenges that the company is facing. Affidavit of Steven Vanderbilt, ¶ 2; Affidavit of Gerald Infantino, ¶ 2; C. Infantino, Aff., ¶ 2. One of those semi-annual meetings was held on July 14, 2005 at the Crown Plaza Hotel in

New York City.  *Id.* at ¶ 3.  Jason Lewis attended this meeting as did ten other sales managers, the Director of Sales and the executive team, which consists of Gerald Infantino, President, Christopher Infantino, Vice President, Steven Vanderbilt, Vice President, William Dierker and Douglas Hanke.  *Id.*

As part of the discussion concerning challenges that the company was facing, Vanderbilt identified two lawsuits, this lawsuit, and a Maryland wrongful discharge action, that had been served on the company within the previous month.  Vanderbilt Aff., ¶ 4.  Castle Point had received service of the complaint in this matter on June 30, 2005, two weeks before the July meeting occurred.  *Id.* at ¶ 4.  Vanderbilt brought up the issue of the lawsuits because he knew that information about the lawsuits was being communicated among employees and he wanted the managers to be aware of the lawsuits if one of the loan officers that reported to them asked a question about the lawsuits.  Vanderbilt thought it would reflect poorly on Castle Point's management team and raise questions about management's knowledge of general business operations if an employee asked a manager about the lawsuits and the manager said he or she knew nothing about them.  *Id.* at ¶ 5.  In addition, to the extent that managers themselves could be hearing about the lawsuits from other current or former employees, Vanderbilt thought it was important that the executive team acknowledge that lawsuits had been filed and to communicate the company's plan for addressing the lawsuits.  *Id.* at ¶ 6.

With respect to this lawsuit, Vanderbilt stated that the lawsuit was brought by two former loan officers from the Massachusetts area who were claiming that they were owed overtime for hours worked in excess of forty hours per week.  *Id.* at ¶ 7.  He said that because Castle Point believed that it had correctly classified the employees as exempt and that loan officers generally did not work over forty hours per week, Castle Point thought that it would win the lawsuit.

Vanderbilt added that at some point, notice would be sent out to all loan officers who could be part of the lawsuit about their ability to join the lawsuit. *Id.* at ¶ 7.

Vanderbilt also communicated that Castle Point would defend itself when it believed it had done nothing wrong out of fear that if the company settled meritless lawsuits without proffering a defense, the company would be perceived as an easy financial target. *Id.* at ¶ 9.

After Vanderbilt's statements, one of the sales managers asked if he could tell the loan officers who reported to him not to join this lawsuit. *Id.* at ¶ 10. Vanderbilt told the group they could absolutely not do that and that it was up to each loan officer to decide whether to join the lawsuit. Vanderbilt further instructed the sales managers that their conduct and statements were attributable to the company, and that if they tried to dissuade a loan officer from joining the lawsuit, that was the same as if the company had done so. His overall instruction to the sales managers was not to discuss the FLSA lawsuit with the loan officers out of fear that something they said could be construed as an effort by the company to interfere with loan officers' ability to join the lawsuit. *Id.* at ¶ 10. Christopher Infantino also stated that there would be no retaliation against any employees who joined the lawsuit. C. Infantino Aff., ¶ 9.

Another sales manager asked how many hours per week the loan officers claimed to be working. Vanderbilt responded as much as 50, 60 and 70 hours per week. The response from the sales managers was that none of the loan officers were working that many hours. *Id.* at ¶ 10. The discussion of the lawsuits lasted approximately five minutes during the course of an approximately four-hour meeting. Following the meeting, there two sales managers asked Christopher Infantino if they could dissuade the loan officers who reported to them from joining the lawsuit. *Id.* at ¶ 14. Infantino reiterated the earlier instructions and further told the sales managers that they should not engage in such conduct because they would be hurting the

company.  *Id.*

Neither Vanderbilt nor Christopher Infantino said during the meeting that this lawsuit was brought by two "disgruntled" former employees for the purpose of "getting even" with Castle Point, or that they had "twisted" an "old law" for their wrongful purposes.  They did not state that Castle Point had more financial resources than anyone who could sue it.  Vanderbilt Aff., ¶¶ 14-15; C. Infantino Aff., ¶¶ 12-13.

2.    *October, 2005.*

In October, 2005, Castle Point had meetings with the loan officers in each of Castle Point's three offices – Massachusetts, New Jersey and Maryland – about a change in policy concerning work hours.  Vanderbilt Aff., ¶ 15; C. Infantino Aff., ¶ 15.  The new policy, implemented October 23, 2005, limited loan officers to a 40-hour work week and required loan officers to submit time sheets each week to confirm their hours.  *Id.*  In the context of introducing the policy, managers explained that Castle Point had been sued by two former loan officers as a result of an alleged failure to pay overtime pay and that while the company believed it had complied with the law, it was changing Castle Point's policy to remove any possible question on the issue.  Vanderbilt Aff., ¶¶ 17-19; C. Infantino Aff., ¶¶ 15-17; G. Infantino Aff., ¶¶ 13-15.

3.    *February, 2006.*

In February, 2006, the Court ruled that notice would be sent to all current and former loan officers concerning their ability to join this lawsuit.  Castle Point has a practice of openly communicating with its employees about major issues within the company.  The senior executives thought failing to acknowledge directly to the employees the notices that they were receiving from Plaintiffs' counsel concerning this lawsuit would be inconsistent with this

practice and, given its inconsistency, could cause employees to question the overall financial viability of the company. Vanderbilt Aff., ¶ 20; C. Infantino Aff., ¶ 18; G. Infantino Aff., ¶ 16.

Accordingly, the senior executives decided that a short message should be communicated by the loan officers' immediate managers about the notice that they would be receiving in the mail. These line managers were instructed to deliver a scripted message (attached as Exhibit B to the Vanderbilt Affidavit), answer any questions, and end the meeting. The scripted message explicitly stated that no one would be retaliated against for joining the lawsuit. Few, if any, questions were posed by the loan officers and the meetings in which the messages were delivered lasted only a few minutes. Vanderbilt Aff., ¶ 17; C. Infantino Aff., ¶ 20; G. Infantino Aff., ¶ 22.

D.     Castle Point Policies.

Castle Point has an Employee Communications Policy, which asks employees who have a job-related issue to first generally seek to address the issue with their supervisor, and if that is unsuccessful, to then contact Gerald Infantino or Christopher Infantino directly. No employees have come to any of the designated recipients with concerns about possible retaliation as a result of opting in to this lawsuit, nor have any employee concerns about possible retaliation been brought to the designated recipients by others. C. Infantino Aff., ¶ 23; G. Infantino Aff., ¶ 25.

E.     Sarah Biehl

Castle Point employed Sarah Biehl as a loan officer from November 21, 2005 until February 28, 2006. C. Infantino Aff., ¶ 24. Like all loan officers at Castle Point, Biehl received internet based leads to pursue for mortgages. Leads are divided into two categories: Lending Tree leads and non-Lending Tree leads. *Id.* at ¶ 25. Lending Tree leads are generally higher quality and result in more closed mortgage transactions. All new loan officers start on non-Lending Tree leads. Within the two groups of leads, there is no difference in the quality or

number of leads that loan officers receive and within each group loan officers receive leads on a random basis. *Id.* at ¶ 25. Approximately every four weeks, Castle Point evaluates the conversion rates of all loan officers and assigns the loan officers with the highest conversion rates from the previous four weeks to the Lending Tree lead sources.[1]  The remaining loan officers are assigned to the non-Lending Tree lead sources. *Id.* at ¶ 26.  Biehl reached a high level of performance fairly quickly and was assigned Lending Tree leads as of January 27, 2006. *Id.* at ¶27.

On approximately February 17, 2006, Biehl went to Christopher Infantino at approximately noon, crying.  She told Infantino that she loved the company but was going to have to quit because she had bills to pay and could not wait until her commissions became payable. *Id.* at ¶ 28. (At Castle Point, loan officers receive a monthly salary of $2,000 but do not receive commission payments until a mortgage is actually funded).  Biehl said she needed additional money at once to pay bills and was going to work full-time as a hairdresser rather than continue to work at Castle Point.  *Id.*

Infantino had been impressed with Biehl's performance so far at Castle Point and told her that he thought she had a good future at Castle Point.  He told her that if it was purely a financial issue, Castle Point could advance her funds based on her future commissions which would then be deducted from her later commission payments over a several month period.  Biehl said that this would "make life easier for her" and gave Infantino a hug before leaving his office. *Id.* at ¶ 29.

On approximately February 21, 2006, Biehl received an advance of $2,165.94 that she cashed that same day. *Id.* at ¶31.  After giving Biehl the advance check, Castle Point learned that

---

[1] A loan officer's conversion rate is the number of closed transactions the loan officer has generated divided by the total number of leads received.

Biehl was interviewing for a position with a competitor. *Id.* at ¶ 32.  Consistent with Castle

Point's practice, Castle Point discharged Biehl the after she admitted that she was looking for a

position with a competitor. *Id.*  Biehl has not repaid the $2,000 advance she received from

Castle Point. *Id.* at ¶ 34.

      F.     <u>Hours Worked By Loan Officers</u>

      Beginning in August, 2005, Castle Point implemented a software program that tracked

the first and last times during the day when there was any type of activity (i.e. any keystroke

activity on the keyboard or any clicking of the mouse) on a loan officer's desktop computer.  G.

Infantino Aff., ¶ 21. Loan officers work via desktops that are tied to a central mainframe

computer and that have no internal hard drives – a loan officer thus cannot use his computer

without accessing the Citrix server.  In addition, virtually all work that Castle Point's loan

officers do requires the use of a computer.  The software program did not subtract time between

the first and last activity of the day when the computer was inactive, e.g. when loan officers were

at lunch or otherwise on breaks.  Loan officers generally take at least an hour break for lunch, in

addition to other breaks during the day.  *Id.* at ¶ 22.

      The average number of hours per week shown by the software program for Loan officers

working five days per week before October 23, 2005 (when Castle Point implemented a

maximum work week of forty hours) was 46.35 hours. *Id.* at ¶ 23.  If five one-hour breaks for

lunch are subtracted (a conservative estimate), this indicates an average workweek of 41.35

hours for loan officers.  *Id.*

III.    Argument

      A.     Plaintiffs Are not Entitled to Injunctive Relief

            1.     <u>The Legal Standard</u>.

While plaintiffs cite the correct overall legal standard for obtaining preliminary injunctive relief – establishing a reasonable likelihood of success on the merits, an imminent threat of irreparable harm in the absence of a preliminary injunction, the balance of harms to the plaintiffs if the injunction is not issued outweighs the harm to Castle Point if the injunction should be issued, and the proposed injunction is not contrary to the public interest – plaintiffs have completely misapplied the likelihood of success on the merits element.  Plaintiffs are seeking to enjoin  Castle Point's alleged retaliatory conduct.  The likelihood of success on the merits that plaintiffs must establish, therefore, to obtain preliminary injunctive relief is success on a retaliation claim against Castle Point, not on plaintiffs' overtime claim.  *See* 29 U.S.C. § 216(b) (no injunctive relief available to private party plaintiff based on claim for unpaid overtime wages).  Plaintiffs' extensive recitation of the alleged merits of their underlying overtime claim is thus wholly irrelevant to a determination of whether injunctive relief is warranted.

> 2.      Plaintiffs Have Failed to Demonstrate that Castle Point's Counterclaims and State Law Complaints Are Retaliatory.

While the FLSA prohibits discrimination against employees because they have "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter," 29 U.S.C. § 215(a)(3), it is not clear that an employer's mere filing of a lawsuit can form the basis for a valid retaliation claim.  *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 532 (5th Cir. 2003) ("[I]t is not obvious that counterclaims or lawsuits filed against a Title VII plaintiff ought to be cognizable as retaliatory conduct under Title VII.  After all, companies and citizens have a constitutional right to file lawsuits, tempered by the requirement that the suits have an arguable basis."); [2] *Murdon v. Brown & Brown, Inc.*, No. 03-C-8708, 2005 U.S. Dist.

---

[2] The standard for retaliation under Title VII is similar to that under the FLSA: "It shall be an unlawful employment practice for an employer to discriminate against his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).

LEXIS 27249, at \*25-26 (N.D. Ill. Nov. 8, 2005) (refusing to find that an employer's breach of contract suit was retaliatory); *see also Earl v. Electro-Coatings of Iowa, Inc.* No. C02-0042, 2002 U.S. Dist. LEXIS 20937, at \* 6-8 (N.D. Iowa Oct. 29, 2002) ("defendants in discrimination suits must have some leeway to investigate possible defenses without undue fear of being subjected to additional liability in retaliation suits") (internal citations omitted).

For those courts which have held that an employer's lawsuit may form the basis for a retaliation claim, the party alleging retaliation must prove two elements: (1) that the lawsuit was filed with a retaliatory motive; and (2) that the lawsuit lacked a reasonable basis in fact or law. *See Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1407 (10th Cir. 1992); *Martinez v. Deaf Smith County Grain Producers*, 583 F. Supp. 1200, 1210 (N.D. Tex. 1984). These two prongs are necessary to protect a party's First Amendment right to petition the courts for redress of grievances. *Martin,* 977 F.2d at 1407; *see also United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967) (right to petition the government, including the courts, is one of the "most precious of the liberties safeguarded by the Bill of Rights").

No where in their motion do plaintiffs even contend that Castle Point's claims lack a reasonable factual or legal basis, a necessary element for showing that a lawsuit is retaliatory. *See Martin,*, 977 F.2d at 1407. Plaintiffs have, in fact, tacitly recognized the merit to Castle Point's claims in their state court motions to dismiss, stating that they "now face the prospect of monetary damages that may exceed [their] recovery under the Fair Labor Standards Act." Reinsmith Memorandum in Support of Motion to Dismiss, ¶ 38; Raffenello Memorandum in Support of Motion to Dismiss, ¶ 38; Dinsdale Memorandum in Support of Motion to Dismiss, ¶

38. If Castle Point's claims lacked a reasonable factual or legal basis, plaintiffs would not be facing such a prospect.[3]

Moreover, Massachusetts courts routinely enforce confidentiality provisions and restrictive covenants similar to the ones on which Castle Point's counterclaims and state court complaints are based. *See e.g. Marine Contractors Co. v. Hurley*, 365 Mass. 280 (1974) (enforcing three-year non-competition agreement in 100-mile radius); *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 718 (1961) (enforcing three-year non competition agreement).

Plaintiffs contend that because Castle Point's claims against plaintiffs were not filed until after plaintiffs filed their complaint, Castle Point's claims must be stayed as retaliatory, *i.e.*, that Castle Point should be barred from asserting its contractual rights now because it did not do so immediately at the time of plaintiffs' breach. That an employer may initially decide to forego enforcing its contractual obligation with certain former employees but later decide to pursue those rights after being sued, so that in the event that the employer is found liable to the employee for damages, those damages can be offset by the amounts owed to the employer by the employee, does not render the employer's lawsuit retaliatory in nature. *See Barnes v. Akal Security*, 2005 U.S. Dist. LEXIS 12268, *18-19 (D. Kan. June 20, 2005) ("mere temporal proximity between the filing of Plaintiff's lawsuit and the alleged retaliatory act, *i.e.*, filing the counterclaims, is not sufficient to establish retaliatory motive.").

Plaintiffs are, in essence, advocating that Castle Point should be barred from seeking any legal remedies against any loan officer merely because the loan officer is a potential class

---

[3] Plaintiffs have altered the focus of their cries of economic harm somewhat in their current federal court filings to claim that it is the cost of defending these state court lawsuits which is having a coercive effect. Plaintiffs' Memorandum , p. 14. Plaintiffs' notice to prospective class members explicitly states that the attorneys for the class plaintiffs are being paid on a contingency basis. *See* Notice, § V. Counsel of record has appeared on behalf of every opt-in on whom Castle Point has been able to effectuate service in the state court proceedings, and it is assumed that the representation is being offered on the same contingent terms. If so, there is thus no "cost of defense" that is inuring to plaintiffs themselves.

member in an FLSA action.  Under plaintiffs' construct, plaintiffs should be permitted to

blatantly steal from the company (which is the effect of a loan officer diverting business

opportunities to a competitor as former loan officer Raffenello did) and Castle Point should then

be barred from seeking any legal recourse while they pursued a FLSA action.  The FLSA anti-

retaliation provision is not a *carte blanche* for employee misconduct.

In sum, plaintiffs have no reasonable likelihood of establishing that Castle Point's state

law claims against the loan officers were without reasonable basis in fact or law, or that they

were filed with a retaliatory motive, and they are thus not entitled to the injunctive relief

requested.

> 3.    Castle Point's Communications With Its Current Employees About the
> Lawsuit Cannot Be Viewed as Retaliatory as a Matter of Law.

Plaintiffs also seek to rely on the affidavits of two former Castle Point employees, Jason

Lewis and Sarah Biehl, to support their allegation that Castle Point has engaged in retaliatory

conduct.  As set forth more fully below, a review of these affidavits shows that they are nothing

more than vague, conclusory and hearsay allegations that cannot be credited.

Even if plaintiffs' allegations were true, which they are not, they do not support a claim

for retaliation under the FLSA.  The FLSA makes it unlawful for an employer "to discharge or in

any other manner discriminate against any employee because such employee has filed any

complaint or instituted or caused to be instituted any proceeding under or related to this chapter,

or has testified or is about to testify in any such proceeding, or has served or is about to serve on

an industry committee."  29 U.S.C. § 215(a)(3).  None of the conduct alleged by Biehl or Lewis

falls within these parameters – there is no alleged discrimination by Castle Point against any

employee for filing or opting in to this lawsuit or for testifying in conjunction with this lawsuit.

Rather, the affidavits only allege statements supposedly made by Castle Point to employees

before they joined this lawsuit.  The only event alleged to have occurred after an employee

joined this lawsuit was the filing of counterclaims or state court complaints by Castle Point,

which as set forth above, do not give rise to a retaliation claim.

> 4.    The Anti-Injunction Act Bars the Relief Requested by Plaintiffs.

As part of their requested relief, plaintiffs have asked this Court to enjoin Castle Point's

state lawsuits against all current and potential opt-ins.  The Anti-Injunction Act, 28 U.S.C. §

2283, specifically states, however, that "a court of the United States may not grant an injunction

to stay proceedings in a State court except as expressly authorized by Act of Congress, or where

necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  The purpose of the

Act is to "forestall the inevitable friction between the state and federal courts that ensues from

the injunction of state judicial proceedings by a federal court."  *Vendo Co. v. Lektro-Vend Corp.*,

433 U.S. 623, 630 (1977).  Any doubts about the propriety of a federal injunction against state

court proceedings are resolved in favor of allowing the state court to proceed to resolve the

action before it.  *Id.*

To evade the bar of the Anti-Injunction Act, two requirements must be met: (1) Congress

must have created a "specific and uniquely federal right or remedy enforceable in a federal court

of equity"; and (2) the Congressional Act can only be given its intended scope by a stay of the

state court proceedings.  *Id.* at 632.  While the injunctive relief afforded under the FLSA may

meet the first element since that relief may only be granted by the federal court, this is not a case

where the FLSA can only be given its intended scope by a stay of state court proceedings.

While a statute need not expressly reference the Anti-Injunction Act to satisfy the second

prong, there must be evidence of congressional authorization of federal courts to enjoin state

court proceedings to overcome the restriction of the Anti-Injunction Act.  *Id.* at 635.  In

*Mitchum v. Foster*, 407 U.S. 225 (1972), the Supreme Court found such authorization present in the legislative history of 42 U.S.C. § 1983 which evidenced a clear congressional concern that state courts had failed to protect certain federally protected rights. *Id.* at 242; *Vendo*, 433 U.S. at 632. In *Vendo Co.*, the Supreme Court found such evidence lacking in the Clayton Act and reversed the lower court's granting of an injunction to enjoin enforcement of a state court judgment for breach of non-competition agreements. 433 U.S. at 633. The Supreme Court has acknowledged that in every case in which an injunction is warranted under the general rules of equity, the Anti-Injunction Act operates to frustrate the purpose of federal policy. *Id.* at 638. This frustration of purpose alone is insufficient to satisfy the second prong of the test. *Id.*

As with *Vendo*, plaintiffs have failed to identify any congressional concern in enacting the FLSA that the state courts would be used to violate the FLSA.[4] *See* 433 U.S. at 634; *see also Paisey v. Vitale,* 634 F. Supp. 741, 744 (S.D. Fla. 1986), *aff'd* 807 F.2d 889 (11th Cir. 1986) (court refuses to stay state court defamation proceedings alleged as retaliatory under Title VII because of Anti-Injunction Act restrictions). Absent such evidence, or evidence of some other express congressional authorization, plaintiffs have failed to demonstrate that this Court has the authority to evade the restrictions of the Anti-Injunction Act by enjoining pending state court proceedings.

B.     Plaintiffs Are Not Entitled to Any Modification of the Notice Period or an Order Limiting Castle Point's Communications With Its Employees.

---

[4] The state courts are well equipped to deal with issues of retaliation – they are able to dismiss the actions, award attorneys' fees and costs for frivolous and bad faith litigation under Mass. Gen. Laws ch. 231, 6F, and impose other sanctions under Mass. R. Civ. P. 11. Indeed, plaintiffs have motions to dismiss pending in the Massachusetts state court actions brought by Castle Point on grounds that the filed actions are retaliatory in nature.

In *Martinez v. Deaf Smith County Grain,* 583 F. Supp. 1200 (N.D. Tex. 1984), a case cited by plaintiffs in support of their request for injunctive relief, the court held that it could enjoin enforcement of a state court default judgment that it deemed retaliatory, but did not identify the express congressional authorization found necessary by the Supreme Court in *Vendo*. *See* 433 U.S. at 632; 583 F. Supp. at 1212. Rather, the *Martinez* court's granting of injunctive relief seemed simply to follow from a generalized determination that a failure to grant injunctive relief where plaintiff had otherwise met the standard for obtaining such relief would frustrate the purpose of Federal policy. *See* 583 F. Supp. at 1212.

1.      There Has Been No Misinformation, Coercion or Retaliation by Castle Point.

On February 17, 2006, after submission of motions by both parties, this Court authorized plaintiffs to send two notices, in a prescribed format, to potential class members, and a 60-day period to opt-in to this action.  Plaintiffs make the bold accusation that Castle Point has engaged in a "campaign of misinformation and intimidation" and "threatened to fire those who joined" to justify their request that the opt-in period be lengthened and a third notice be sent.[5]  Plaintiffs' Brief, p. 10, 15.  In addition to their allegations concerning the state law claims of Castle Point, which as set forth above cannot be shown to be retaliatory, plaintiffs rely on the affidavits of two former Castle Point loan officers – Jason Lewis and Sarah Biehl – to support their accusations.  A review of these affidavits shows that they are nothing more than vague, conclusory and hearsay allegations that cannot be credited.

In her affidavit, Biehl claims she "was afraid" that Castle Point would fire her or see that she did not receive any quality leads if she opted into the lawsuit.  Biehl Aff., ¶ 6.  She identifies not a single statement by anyone at Castle Point that led her to this supposed fear.  She goes onto claim that Castle Point, "as a matter of policy made it clear that it would retaliate against anyone who joined the Reinsmith lawsuit."  Biehl Aff., ¶ 6.  Again, not a single statement of anyone at Castle Point is detailed as support for this alleged policy.  She then refers to unnamed fellow loan officers who supposedly harbor the same fears as she does.  Biehl Aff., ¶ 7.  The extraordinary accusations made by plaintiffs should be supported by more than vague, conclusory, and hearsay

---

[5] In apparent reference to that provision of the Court's Order that restricts plaintiffs' counsel from initiating contact with potential class members outside the two written notices, plaintiffs allege that Castle Point "silenced" plaintiffs' counsel's communications with potential class members.  The limitation contained in the Court's order merely follows the Massachusetts Rules of Professional Conduct which restrict an attorney's ability to "solicit professional employment for a fee from a prospective client in person or by telephone, electronic device, or otherwise."  Mass. R. Prof. Conduct 7.3(d).

allegations.[6] *See Burrell v. Crown Central Petroleum*, 176 F.R.D. 239, 245 (E.D. Texas 1997) (sworn declarations attesting only to generalizations about defendant's statements regarding litigation to its employees provide insufficient basis for court to issue protective order limiting employer's communications with potential class members).

Biehl also alleges that shortly after she complained to her manager that she was working extensive overtime without pay, she was fired – an allegation that plaintiffs then use to argue that Castle Point "made good on its threats by firing her shortly after she complained to her boss that she was working unpaid overtime." Biehl Aff., ¶ 5; Plaintiffs' Memo, p. 15. What Biehl omits from her affidavit is that she was fired <u>after</u> Castle Point advanced her approximately $2,000 to assist her in her financial difficulties when it learned, shortly after Biehl cashed the advance check, that she was interviewing for a position with a competitor, and that she was informed that this was the reason for her discharge on the day she was discharged. C. Infantino Aff., ¶¶ 28-33.

Jason Lewis' affidavit is similarly vague. He claims that during a July, 2005, meeting, Christopher Infantino and Vanderbilt "actively discouraged" managers from joining this lawsuit, Lewis Aff., ¶ 7, yet provides no statements by either individual to support this claim. He also

---

[6] In addition to their vague misleading affidavits, plaintiffs, on several occasions, mis-characterize case law. For example, plaintiffs cite *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985), for the proposition that "courts have consistently held that a low response rate is strong evidence of coercion by the defendant," yet a review of that case finds only the court's statement that 2,800 opt out requests from a group of 3,000 potential class members whom defendant bank contacted by telephone in a planned campaign to have as many class members opt out as possible was "witness to the inherent coercion of the Bank's machinations." *Id.* at 1202. Similarly, in *Bailey v. Gulf Coast Transp., Inc.*, 280 F.3d 1336 (11th Cir. 2002), the Eleventh Circuit found only that preliminary injunctive relief was available to private party plaintiffs in an FLSA retaliation claim. *Id.* at 1334. Contrary to plaintiffs' assertions, the Eleventh Circuit made no finding as to whether preliminary injunctive relief was warranted in the case before it and remanded the case to the district court for a determination of whether plaintiffs had met the requirements to obtain a preliminary injunction. *Id.* at 1337. Plaintiffs then stretch the court's statement in *Recinos-Recinos v. Express Forestry, Inc.*, 2006 U.S. Dist. LEXIS 2510 (E.D. La. 2006), that "an ongoing business relationship between the defendants and the plaintiffs and the potential plaintiffs <u>may</u> cause communications to be coercive," *Id.* at *39 (emphasis added), into the proposition that "courts will not hesitate to find <u>any</u> communications about pending litigation 'inherently coercive'." Plaintiffs' Brief, p. 17 (emphasis added). In *Recinos*, the employer's agent had traveled to a remote Guatemalan town to speak with seasonal workers about a pending FLSA action, followed by in-person visits by the employer's foremen and crew members to workers' homes. *Id.* at *11-14.

claims that Infantino and Vanderbilt "led [the managers] to believe the case was baseless," Lewis Aff., ¶ 9, yet again provides no actual statements made by Infantino or Vanderbilt.  Lewis concludes with the claim that "he learned that Castle Point held mandatory meetings with its loan officers to inform them of this lawsuit and to dissuade them from joining."  Lewis Aff., ¶ 12. Not only is this a hearsay statement in which Lewis does not even identify who the supposed source of the information was, he also, once again, does not specify what was said to "dissuade" loan officers from joining the lawsuit, or who the alleged speakers were.

Both the Lewis and Biehl affidavits are more notable for what they omit than the allegations they do contain.  The July, 2005, discussion that Lewis references was an approximately five-minute discussion during a 4-hour meeting, designed to alert the managers to the existence of the litigation so that they would not be blindsided by news of the lawsuits from their subordinates or from others within the company.  Vanderbilt Aff., ¶¶ 4-13; *see Burrell*, 176 F.R.D. at 245 ("Simply because the company chooses to kept its employees informed of litigation affecting the company does not attach an improper motive").  Lewis also omits Vanderbilt's emphatic statement from the July, 2005, meeting that sales managers were not to dissuade loan officers from joining the lawsuit, or Christopher Infantino's statement that there would be no retaliation against anyone who joined the lawsuit.   Vanderbilt Aff., ¶ 10; C. Infantino Aff., ¶ 9.

Biehl, who was employed at the time of the "mandatory meeting" referenced by Lewis, does not mention it in her affidavit, most likely because there are no negative aspersions that she can make as a result of the meeting.  The meeting merely announced that loan officers would be receiving notice about the lawsuit that Castle Point disagreed with the allegations in the lawsuit, and stated, once again, that there would be no retaliation by Castle Point against employees who

joined the lawsuit.  Vanderbilt Aff., ¶¶ 18-20.

In addition, the opt-in notice that all potential class members received twice also contains the statement in bold and all capitals "No Retaliation Permitted," and beneath that in regular text: "Federal law prohibits Castle Point Mortgage, Inc. from discharging or in any other manner discriminating against you because you join this lawsuit."  The notice also states that "Castle Point contends that the Loan Officers were properly classified as exempt employees and are not entitled to overtime pay in addition to the commissions and salaries they received."

To the limited extent that Castle Point has communicated with its employees about this lawsuit, its message has been consistent, and is the same as that contained in the opt-in notice itself:  (1) there will be no retaliation against anyone who joins the lawsuit; and (2) Castle Point believes it has a meritorious defense to the claims alleged.

The only misinformation that has been disseminated about this lawsuit has been by plaintiffs' counsel through their website, www.castlepointmortgageclassaction.com, which has been operational since at least August, 2005.[7]  The website claims that a "nationwide class action" has been filed when plaintiffs' counsel knows (or should know) that Castle Point Mortgage has offices in only three locations: Maryland, New Jersey and Massachusetts.  The website also includes links to two U.S. Department of Labor opinion letters which, according to the website, "specifically categorize 'loan officers' as entitled to overtime," implying that the DOL in involved in, or has otherwise endorsed this lawsuit, which it has not.  The site also contains numerous other misleading statements:

> · "*loan officers . . . routinely work 50, 60 and 70 hours per week.*"  Castle Point has data, which has been shared with plaintiffs' counsel, demonstrating that over an eight-week period, no loan officer routinely worked even 50 hours per week.
> · "*determinative factors include whether the primary duties and responsibilities of the employee comply with applicable federal standards and are commonly associated with*

---

[7] Pages from plaintiffs' website are attached as Exhibit C.

*management*."  The issue in this lawsuit is not whether loan officers fit within the executive (or "management") exemption, but rather whether the administrative or retail sales exemptions are applicable.

· "*Plaintiffs also allege that these employees spent most of their 50 hour plus workweeks engaged in non-managerial duties and that they have not been properly compensated for overtime*."  Again, this is not a case about whether plaintiffs engaged in management or non-management duties.

· "*Employers often give employees fancy administrative titles (such as "Loan Officers") for the purpose of exempting them from overtime pay*."  Plaintiffs have provided no support for this blanket generalization and have no evidence that it bears any application to Castle Point.

        2.     The Plaintiffs Are Not Entitled to a "Corrective Notice" or an Extension of the Opt-In Period.

Corrective notices may be warranted when a party engages in threatening or coercive conduct towards class members.  *See Haffer v. Temple University*, 115 F.R.D. 506, 513 (1987) (university's request that male student-athletes contact university in Title IX action before meeting with plaintiffs' counsel does not require corrective notice); *Vega v. Bloomsburgh*, 427 F. Supp. 593 (D. Mass. 1977) (state officials' memorandum to employees who were potential witnesses in class action litigation instructing them not to meet with plaintiffs' counsel without approval of employer warranted corrective notice).  In addition, any order requiring curative notice should include "specific findings of actual or potential abuse or misconduct."  *Parks v. Eastwood Ins. Services, Inc.*, 235 F. Supp. 2d 1082, 1085 (S.D. Cal. 2002).  In the limited number of cases in which courts have ordered some type of corrective notice, it has only been in the presence of egregious conduct by defendants.  *See e.g., Belt v. Emcare, Inc*, 299 F. Supp. 2d 664, 667, 670 (E.D. Tex. 2003) (in FLSA collective action brought by nurse practitioners and physicians' assistants, corrective notice issued and opt-in period extended by 30 days after defendant sent a letter to potential class members that suggested that lawsuit was attack on plaintiffs' status as professionals, incorrectly represented amount of damages sought, played into fears held by many health care workers by equating lawsuit with medical malpractice action, and

suggested that lawsuit could endanger employees' job stability); *Haffer*, 115 F. Supp. 2d at 510-512) (corrective notice sent to class members in Title IX action after defense counsel orchestrated communication with class members that violated state Rules of Professional Conduct, misstated scope of class and legal resources available to class members, dissuaded class members from meeting with class counsel, and encouraged class members to instead contact the defendant university).

As set forth above, there was nothing threatening or coercive in Castle Point's communications with its employees concerning this lawsuit. Rather, Castle Point's communications are analogous to those that occurred in *Parks*, where the court found that curative notice was not warranted. In *Parks*, the CEO of the employer in a FLSA collective action sent employees who were potential class members a memorandum stating that the "company disagrees with the allegation and is aggressively defending the lawsuit," instructing employees to disregard rumors and to not let the lawsuit distract them from the company's business objectives, and directed questions concerning the lawsuit to the employer's general counsel. 235 F. Supp. 2d at 1085. Castle Point has similarly communicated that it disagrees with the allegations in the lawsuit and that it intends to defend itself, and has added that there will be no retaliation against any employee who joins the lawsuit. As with *Parks*, no remedial notice is warranted or appropriate in this case, nor is there any justification for extension of the opt-in period. 235 F. Supp. 2d at 1085.

> 3.    Without Evidence of Coercion Or Abuse, An Order Limiting Communications With Potential Class Members Is Inappropriate.

A court may not limit communications between a party and potential class members absent a "specific record showing by the moving party of the particular abuses by which it is threatened." *Gulf Oil v. Bernard*, 452 U.S. 89, 102 (1981). In addition, there must be "a clear

record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. "With no evidence of coercion, abuse, or even potential abuse, an order limiting contact is inappropriate." *Burrell v. Crown Central Petroleum*, 176 F.R.D. 239, 245 (E.D. Texas 1997) (employer email to employees linking race and gender class action to "union corporate campaign" and two employee meetings regarding litigation does not justify limitation on employer's communications with potential class members).

Contrary to the plaintiffs' assertions, the mere existence of an employer-employee relationship is not enough to mandate a finding of coercion in the employer's communications with its employees regarding pending litigation. *See McLaughlin v. Liberty Mutual Ins. Co.*, 224 F.R.D. 295, 298 (D. Mass. 2004) ("Citing a few cases hither and thither . . . plaintiffs say that the employer-employee relationship is all that is required to warrant preclusion of communications because the relationship is inherently coercive. That may be the take of reality of the judges to whom plaintiffs refer, but this court sees it otherwise."), *Burrell,* 176 F.R.D. at 245; *Basco v. Wal-Mart Stores*, No. Civ. A. 00-3184, 2002 WL 272384, at *3 (E.D. La. February 25, 2002); 176 F.R.D. at 242. For example, in *Burrell*, plaintiffs sought an order limiting defendant's contact with class members, alleging that defendant tried to discourage employees from joining a class action lawsuit by intimating that the lawsuit was a "union activity" with which plaintiffs should not associate themselves. *Id*. at 241-42. But the defendants argued, and the court agreed, that its communications were normal updates on the litigation and that it had a right to inform its employees of its position on litigation that would affect the company's future. *Id.* at 242. The court found that plaintiff's sworn declarations, which included only "generalizations" and representations about "the gist of" the company's presentations, were insufficient to support an

order restraining the defendant. *Id.* at 245. Here, as in *Burrell*, there is no campaign to discourage employees from opting in to the lawsuit, and the plaintiffs cannot point to one. Over the 10 months that this lawsuit has been pending, Castle Point has had extremely limited communications with its employees concerning the lawsuit, and the purpose of those announcements was to acknowledge the litigation, answer questions, and inform employees that they would not be subject to retaliation if they opted into the suit. The plaintiffs' vague and conclusory allegations to the contrary are not enough to support an order limiting Castle Point's communications with potential class members.

A review of other applicable case law, including those cases cited by plaintiffs, demonstrates that courts have enjoined defendants from communicating with class members only in situations where defendants have engaged in conduct which is patently coercive and threatening. *See e.g., Kleiner v. First Natl'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) (enjoining communications after defendant bank telephoned 3000 potential plaintiffs in organized campaign specifically to encourage them to opt out of lawsuit); *Recinos-Recinos v. Express Forestry, Inc.*, Civ. Act. No. 05-1355, 2006 U.S. Dist, LEXIS 2510 (E.D. La. January 24, 2006) (enjoining communications after employer traveled to Guatemala to speak to indigent, seasonal employees about the lawsuit, and shortly thereafter, potential plaintiffs received threatening visits at their own homes); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d at 664, 66, 670 (E.D. Tex. 2003).

    C.    <u>The Remaining Relief Requested By Plaintiffs is Also Not Warranted.</u>

Plaintiffs also seek an order enjoining Castle Point from discharging or taking any adverse employment action against individuals for joining this lawsuit or providing testimony in connection with it. Castle Point has not, and will not, engage in such retaliatory conduct towards

its employees but no injunctive relief is warranted on this issue. Plaintiffs also seek to enjoin Castle Point from "black listing" or communicating with any class members' or potential class members' employer or future employer. This requested relief is patently overbroad – it would, for example, apply to bar Castle Point from confirming a loan officer's dates of employment as part of a future employer's routine background check. Moreover, there is no evidence that Castle Point has sought to "black list" any former employee or otherwise interfere with their employment outside Castle Point.

## IV.   CONCLUSION

For reasons stated above, Castle Point requests that this Court deny Plaintiffs' Motion for Temporary Restraining Order and Other Relief.

CASTLE POINT MORTGAGE, INC.,

By its attorney,

/s Christa von der Luft
Christa von der Luft (BBO#600362)
Allison Burroughs (BBO#609346)
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  April 11, 2006

1519416.1

EXHIBIT A



**Castle Point Mortgage, Inc.**
**9151 Rumsey Road, Suite 190**
**Columbia MD, 21045-1946**
**Phone (800) 469-4850   Fax (800) 461-0346**

# LOAN OFFICER CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT ("AGREEMENT") is made and entered into on ___APRIL 1, 2003___ by and between CASTLE POINT MORTGAGE, INC. ("CPM") and ___PAUL REINSMITH___ ("Employee").

### WITNESSETH:

**WHEREAS**, CPM has offered Employee employment provided that Employee meets certain terms and conditions;

**WHEREAS**, in connection with Employee's duties as a loan officer, Employee will have access to and/or be provided with and, in some circumstances, prepare and create confidential and proprietary business information and trade secrets belonging to CPM; and

**WHEREAS**, as a precondition to Employee's employment with CPM, CPM has required assurance by Employee that CPM's confidential and proprietary information and trade secrets will be fully protected as hereinafter provided, and that both during and after the term of employment, Employee will not compete with CPM except as hereinafter provided; and

**WHEREAS**, Employee is desirous of accepting employment and the substantial benefits to Employee flowing from that employment and as a condition of that employment, Employee is willing and has agreed to abide by and faithfully observe Employee's obligations as set forth herein.

**NOW, THEREFORE**, in consideration of the offer of employment and the mutual

-1-

covenants and agreements herein contained, and in reliance upon the recitals set forth above, which are incorporated herein by reference, it is agreed between the parties hereto as follows:

## AGREEMENT

### 1.    Acknowledgments of Employee

Employee acknowledges that, in connection with Employee's employment as a loan officer, and in consideration of this Agreement, Employee will receive or will become eligible to receive substantial consideration, including but not limited to salary and employee benefits. Employee further acknowledges that the position of loan officer and all benefits and potential benefits to Employee from employment in that capacity will be conferred by CPM upon Employee only because and on condition of Employee's willingness to commit her/his best efforts and loyalty to CPM, including abiding by the confidentiality, non-competition, non-solicitation and other provisions of this Agreement. Employee also acknowledges that, in event of any violation of this Agreement by Employee, monetary damages alone will be inadequate to compensate CPM and CPM will be entitled to injunctive relief against Employee in addition to any other remedies provided by law or in equity.

### 2.    Prior Employment

Employee covenants that he/she is not subject to any employment contract, including restrictive covenants or non-competition, non-solicitation or confidentiality agreements, with any prior employers or arising out of his employment with CPM. Employee also covenants that his/her employment, by and with CPM, does not and will not breach any employment agreement that Employee executed, including restrictive covenants or non-competition or non-solicitation agreements, prior to his/her employment with CPM. Employee further covenants that his/her employment by and with CPM does not and will not breach any agreement that Employee executed, in which Employee promised or agreed to keep proprietary information obtained by Employee prior to his/her employment with CPM confidential. Employee further represents that Employee has not brought and will not bring any confidential information of a prior employer to CPM or use any such confidential information in the performance of his/her employment with CPM.

### 3.    Confidentiality

Employee acknowledges that as a loan officer of CPM, Employee shall have access to, learn, be provided with and in some cases will prepare and create certain confidential and propriety information and trade secrets of CPM. Employee therefore agrees that he/she shall not, during the term of this Agreement or at any time thereafter, reveal, disclose or divulge, or otherwise use or exploit, either directly or indirectly, to any person, firm, partnership, agency, corporation, or other entity, any proprietary information belonging to CPM, including, but not limited to any of the following: operating manuals, any information concerning CPM's business, formulas, patterns, devices, protocols, systems, processes, methods, employee lists, customer

lists, client lists, vendor information, vendor lists, referral source information, referral source lists, designs, procedures, techniques, inventions, computer programs, contracts, contract forms, business forms, pricing and identities, addresses, telephone numbers, electronic mail addresses, or other methods of contacting persons or business entities who use the services of or have been clients or customers of CPM, the internal business organization of CPM, its structure, financial information, provider contracting arrangements, benefit plans, performance standards, quality information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, or lists of actual or potential customers or suppliers, all of which are of substantial value to CPM in its business.

Employee understands and agrees that if, during the term of his/her employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the aforementioned confidential and proprietary information and trade secrets, except as may be required by Employee's duties with CPM, such conduct shall constitute a breach of the confidence and trust bestowed upon Employee by CPM and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate in the event of such conduct by Employee.

Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any information of a confidential or proprietary nature, trade secrets or any other knowledge or information, except that which is public knowledge, of or relating to the business of CPM at any time during or after Employee's term of employment with CPM, without the express prior written consent of CPM.

## 4.    Return of Information

Immediately upon or prior to the termination of employment with CPM, Employee agrees to return to CPM, and not retain a copy of, all written information, materials, or equipment, records of research, proposals, reports, memoranda, computer software and programming, budgets and other financial information, documents, and other materials or records or writings of any type, including copies thereof, made, used or obtained by Employee in connection with his/her employment with CPM. For purposes of this Agreement, the words "document" or "material" mean any computer disk, tape, or other medium for the storage and/or retention of information, data, or program in electromagnetic or digital form.

## 5.    Non-solicitation

Employee agrees that during his/her employment and for a period of one (1) year following the termination of Employee's employment with CPM, whether voluntary or involuntary, Employee shall not, other than on behalf of CPM, either personally, as a consultant, or through an employer, firm, agent, servant, employee, partner, stockholder, representative, affiliate, or other entity, contact or solicit, directly or indirectly, prospective, current or former

clients, customers, or referral sources, or employees of CPM.

6.    Non-competition

Employee agrees that both during the term of his/her agreement and for a period of six (6) months following the termination of his/her employment with CPM for any reason, whether voluntary or involuntary, Employee will not compete directly or indirectly, intentionally or unintentionally with CPM, including without limitation, soliciting, engaging, or participating in, becoming employed by or rendering any other services to any other person, partnership, corporation, or other entity engaged in some or all of the same business as CPM and/or any business similar to or in competition with CPM, in the following states: Maryland, New Jersey, New York or Massachusetts (the "Non-competition Area").

Employee also agrees that both during the term of his/her employment and for a period of six (6) months following the termination of his/her employment, whether voluntary or involuntary, Employee will not be associated with, either as an employee, consultant, partner, affiliate, agent, individual, officer, director, or shareholder any business entity that engages in mortgage brokerage services or any other products or services offered by CPM or which directly or indirectly competes with any website, service or product of CPM, in the Non-competition Area.

7.    Enforcement Not A Hardship

Employee agrees that any cause of action that he/she may have against CPM does not constitute a defense to the enforcement of this Agreement. Employee also agrees that the restrictions set forth in this Agreement, both in terms of geographic and time limitations and with regard to confidentiality and non-solicitation, do not unduly or unreasonably interfere with his/her ability to obtain employment in his/her chosen field.

Employee acknowledges that a breach of any of the restrictions set forth in this Agreement by Employee will result in irreparable injury which is inadequately compensable in damages or other legal remedies, and that CPM may seek injunctive relief against the breach, or threatened breach of this Agreement and/or specific performance and damages, as well as other legal and equitable remedies including attorney's fees which may be available and to which CPM may be entitled.

8.    Representations by the Employee

Employee hereby represents that Employee has had an opportunity to review this Agreement; Employee has read and fully understands Employee's duties and obligations as set forth in this Agreement, and Employees agrees that the restrictions set forth in this Agreement would not unduly or unreasonably interfere with or curtail Employee's ability and legitimate efforts to obtain employment in Employee's chosen field or to earn a livelihood following any termination of Employee's employment with CPM.

-4-

9.   Covenant as Independent Agreement

The covenants on the part of Employee, set forth in this Agreement, shall be construed as an agreement independent of any other agreement or promise between Employee and CPM, and the existence of any claim or cause of action alleged by Employee against CPM shall not constitute a defense to enforcement of this Agreement by CPM against Employee.

10.   Severability

If any term, provision or paragraph of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of the Agreement which shall continue to be given full force and effect. If any term or provision of the Non-competition and Non-solicitation sections of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable because the time period and/or geographic areas or scope of restriction exceeds the maximum time period, geographic area, or scope, then the appropriate provisions set forth herein shall be amended to conform to the maximum time period, areas of restriction and scope of restrictions which the court shall deem necessary to permit enforcement of such term, provision or paragraph in restricted form. Should any court of competent jurisdiction find any term, provision or paragraph of this Agreement invalid or unenforceable, or enforceable only in restricted form, then any such finding shall apply only to the jurisdiction of such court and shall not serve to alter or amend this Agreement in any other jurisdiction.

11.   Successors and Assigns

This Agreement shall be binding upon Employee and all of Employee's heirs and legal representatives and shall be binding upon and inure to the benefit of CPM, its successors and assigns.

12.   Waiver of Breach

The waiver by CPM of a breach by Employee of any provision or covenant of this Agreement shall not operate or be construed as a waiver of any subsequent breach by Employee.

13.   Notification

During Employee's employment, and for a period of six (6) months following termination of his/her employment with CPM, Employee agrees to inform any prospective employer (whether directly or indirectly contacted) of the existence of this Agreement and to show a copy of this Agreement to any prospective employer.

14.   Captions

The captions of the paragraphs and provisions of this Agreement are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement or any of the provisions hereof.

15.    Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland.

16.    Complete Agreement

This Agreement constitutes the entire and only understanding and agreement between the parties hereto with respect to the subject matter hereof and, except as expressly set forth herein, may be amended only by a writing signed by each of the parties hereto.   All prior or contemporaneous understandings, discussions or agreements with respect to said subject matter are expressly superseded by the Agreement.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**

**CASTLE POINT MORTGAGE, INC.**

By: _____
Gerald Infantino, President

**WITNESS**

By: _____
Employee

145757

-6-

EXHIBIT B



**Castle Point Mortgage, Inc.**
**9151 Rumsey Road, Suite 190**
**Columbia MD, 21045-1946**
**Phone (800) 469-4850   Fax (800) 461-0346**

# LOAN OFFICER CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT

THIS CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT ("AGREEMENT") is made and entered into on ___9/1/03___ by and between CASTLE POINT MORTGAGE, INC. ("CPM") and ___Kevin Dinsdale___ ("Employee").

### WITNESSETH:

**WHEREAS**, CPM has offered Employee employment provided that Employee meets certain terms and conditions;

**WHEREAS**, in connection with Employee's duties as a loan officer, Employee will have access to and/or be provided with and, in some circumstances, prepare and create confidential and proprietary business information and trade secrets belonging to CPM; and

**WHEREAS**, as a precondition to Employee's employment with CPM, CPM has required assurance by Employee that CPM's confidential and proprietary information and trade secrets will be fully protected as hereinafter provided, and that both during and after the term of employment, Employee will not compete with CPM except as hereinafter provided; and

**WHEREAS**, Employee is desirous of accepting employment and the substantial benefits to Employee flowing from that employment and as a condition of that employment, Employee is willing and has agreed to abide by and faithfully observe Employee's obligations as set forth herein.

**NOW, THEREFORE**, in consideration of the offer of employment and the mutual

-1-

covenants and agreements herein contained, and in reliance upon the recitals set forth above, which are incorporated herein by reference, it is agreed between the parties hereto as follows:

## AGREEMENT

### 1.    Acknowledgments of Employee

Employee acknowledges that, in connection with Employee's employment as a loan officer, and in consideration of this Agreement, Employee will receive or will become eligible to receive substantial consideration, including but not limited to salary and employee benefits. Employee further acknowledges that the position of loan officer and all benefits and potential benefits to Employee from employment in that capacity will be conferred by CPM upon Employee only because and on condition of Employee's willingness to commit her/his best efforts and loyalty to CPM, including abiding by the confidentiality, non-competition, non-solicitation and other provisions of this Agreement. Employee also acknowledges that, in event of any violation of this Agreement by Employee, monetary damages alone will be inadequate to compensate CPM and CPM will be entitled to injunctive relief against Employee in addition to any other remedies provided by law or in equity.

### 2.    Prior Employment

Employee covenants that he/she is not subject to any employment contract, including restrictive covenants or non-competition, non-solicitation or confidentiality agreements, with any prior employers or arising out of his employment with CPM. Employee also covenants that his/her employment, by and with CPM, does not and will not breach any employment agreement that Employee executed, including restrictive covenants or non-competition or non-solicitation agreements, prior to his/her employment with CPM. Employee further covenants that his/her employment by and with CPM does not and will not breach any agreement that Employee executed, in which Employee promised or agreed to keep proprietary information obtained by Employee prior to his/her employment with CPM confidential. Employee further represents that Employee has not brought and will not bring any confidential information of a prior employer to CPM or use any such confidential information in the performance of his/her employment with CPM.

### 3.    Confidentiality

Employee acknowledges that as a loan officer of CPM, Employee shall have access to, learn, be provided with and in some cases will prepare and create certain confidential and propriety information and trade secrets of CPM. Employee therefore agrees that he/she shall not, during the term of this Agreement or at any time thereafter, reveal, disclose or divulge, or otherwise use or exploit, either directly or indirectly, to any person, firm, partnership, agency, corporation, or other entity, any proprietary information belonging to CPM, including, but not limited to any of the following: operating manuals, any information concerning CPM's business, formulas, patterns, devices, protocols, systems, processes, methods, employee lists, customer

lists, client lists, vendor information, vendor lists, referral source information, referral source lists, designs, procedures, techniques, inventions, computer programs, contracts, contract forms, business forms, pricing and identities, addresses, telephone numbers, electronic mail addresses, or other methods of contacting persons or business entities who use the services of or have been clients or customers of CPM, the internal business organization of CPM, its structure, financial information, provider contracting arrangements, benefit plans, performance standards, quality information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, or lists of actual or potential customers or suppliers, all of which are of substantial value to CPM in its business.

Employee understands and agrees that if, during the term of his/her employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the aforementioned confidential and proprietary information and trade secrets, except as may be required by Employee's duties with CPM, such conduct shall constitute a breach of the confidence and trust bestowed upon Employee by CPM and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate in the event of such conduct by Employee.

Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any information of a confidential or proprietary nature, trade secrets or any other knowledge or information, except that which is public knowledge, of or relating to the business of CPM at any time during or after Employee's term of employment with CPM, without the express prior written consent of CPM.

4.    Return of Information

Immediately upon or prior to the termination of employment with CPM, Employee agrees to return to CPM, and not retain a copy of, all written information, materials, or equipment, records of research, proposals, reports, memoranda, computer software and programming, budgets and other financial information, documents, and other materials or records or writings of any type, including copies thereof, made, used or obtained by Employee in connection with his/her employment with CPM. For purposes of this Agreement, the words "document" or "material" mean any computer disk, tape, or other medium for the storage and/or retention of information, data, or program in electromagnetic or digital form.

5.    Non-solicitation

Employee agrees that during his/her employment and for a period of one (1) year following the termination of Employee's employment with CPM, whether voluntary or involuntary, Employee shall not, other than on behalf of CPM, either personally, as a consultant, or through an employer, firm, agent, servant, employee, partner, stockholder, representative, affiliate, or other entity, contact or solicit, directly or indirectly, prospective, current or former

clients, customers, or referral sources, or employees of CPM.

6.    Non-competition

Employee agrees that both during the term of his/her agreement and for a period of six (6) months following the termination of his/her employment with CPM for any reason, whether voluntary or involuntary, Employee will not compete directly or indirectly, intentionally or unintentionally with CPM, including without limitation, soliciting, engaging, or participating in, becoming employed by or rendering any other services to any other person, partnership, corporation, or other entity engaged in some or all of the same business as CPM and/or any business similar to or in competition with CPM, in the following states: Maryland, New Jersey, New York or Massachusetts (the "Non-competition Area").

Employee also agrees that both during the term of his/her employment and for a period of six (6) months following the termination of his/her employment, whether voluntary or involuntary, Employee will not be associated with, either as an employee, consultant, partner, affiliate, agent, individual, officer, director, or shareholder any business entity that engages in mortgage brokerage services or any other products or services offered by CPM or which directly or indirectly competes with any website, service or product of CPM, in the Non-competition Area.

7.    Enforcement Not A Hardship

Employee agrees that any cause of action that he/she may have against CPM does not constitute a defense to the enforcement of this Agreement. Employee also agrees that the restrictions set forth in this Agreement, both in terms of geographic and time limitations and with regard to confidentiality and non-solicitation, do not unduly or unreasonably interfere with his/her ability to obtain employment in his/her chosen field.

Employee acknowledges that a breach of any of the restrictions set forth in this Agreement by Employee will result in irreparable injury which is inadequately compensable in damages or other legal remedies, and that CPM may seek injunctive relief against the breach, or threatened breach of this Agreement and/or specific performance and damages, as well as other legal and equitable remedies including attorney's fees which may be available and to which CPM may be entitled.

8.    Representations by the Employee

Employee hereby represents that Employee has had an opportunity to review this Agreement; Employee has read and fully understands Employee's duties and obligations as set forth in this Agreement, and Employees agrees that the restrictions set forth in this Agreement would not unduly or unreasonably interfere with or curtail Employee's ability and legitimate efforts to obtain employment in Employee's chosen field or to earn a livelihood following any termination of Employee's employment with CPM.

-4-

9.    Covenant as Independent Agreement

The covenants on the part of Employee, set forth in this Agreement, shall be construed as an agreement independent of any other agreement or promise between Employee and CPM, and the existence of any claim or cause of action alleged by Employee against CPM shall not constitute a defense to enforcement of this Agreement by CPM against Employee.

10.    Severability

If any term, provision or paragraph of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of the Agreement which shall continue to be given full force and effect. If any term or provision of the Non-competition and Non-solicitation sections of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable because the time period and/or geographic areas or scope of restriction exceeds the maximum time period, geographic area, or scope, then the appropriate provisions set forth herein shall be amended to conform to the maximum time period, areas of restriction and scope of restrictions which the court shall deem necessary to permit enforcement of such term, provision or paragraph in restricted form. Should any court of competent jurisdiction find any term, provision or paragraph of this Agreement invalid or unenforceable, or enforceable only in restricted form, then any such finding shall apply only to the jurisdiction of such court and shall not serve to alter or amend this Agreement in any other jurisdiction.

11.    Successors and Assigns

This Agreement shall be binding upon Employee and all of Employee's heirs and legal representatives and shall be binding upon and inure to the benefit of CPM, its successors and assigns.

12.    Waiver of Breach

The waiver by CPM of a breach by Employee of any provision or covenant of this Agreement shall not operate or be construed as a waiver of any subsequent breach by Employee.

13.    Notification

During Employee's employment, and for a period of six (6) months following termination of his/her employment with CPM, Employee agrees to inform any prospective employer (whether directly or indirectly contacted) of the existence of this Agreement and to show a copy of this Agreement to any prospective employer.

14.    Captions

-5-

The captions of the paragraphs and provisions of this Agreement are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement or any of the provisions hereof.

15.    Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland.

16.    Complete Agreement

This Agreement constitutes the entire and only understanding and agreement between the parties hereto with respect to the subject matter hereof and, except as expressly set forth herein, may be amended only by a writing signed by each of the parties hereto.   All prior or contemporaneous understandings, discussions or agreements with respect to said subject matter are expressly superseded by the Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, the parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                                          **CASTLE POINT MORTGAGE, INC.**

By: _____
                                                      Gerald Infantino, President

**WITNESS**

                                                      By: _____
_____                        Employee

145757

-6-

EXHIBIT C



Home | Updates | In The News | Court Rulings | Case Law | Opt-in | Notice | FAQ | Co

click her
Freque
Aske
Questi

# Class Action Alert

**CASTLE POINT MORTGAGE** | Overtime Class Action Update

## UPDATES
**Click here** for class action updates, news and current status.

## PRESS COVERAGE!
**Click here** for Castle Point Mortgage exposés and news articles.

## IMPORTANT NOTICE—
Please read carefully
**If you are currently employed, or have been employed in the past three years, by Castle Point Mortgage as a loan officer, you may be entitled to lost overtime wages.**

If you have any information or questions regarding this matter – or if you believe you meet the criteria – we strongly urge you to contact us immediately. For more information regarding your legal rights, click here to view the Court Approved Class Action Notice and Opt-in Consent Form.

**Please note: Because of time limits associated with this type of case, it is important that we hear from you as soon as possible. Simply print out the Opt-in Consent Form, sign it and mail it to the address indicated.**



## Castle Point Mortgage Wage and Hour Violations

On June 6, 2005, Touhy & Touhy, Ltd., and Erik H. Langeland, P.C. filed a nationwide class action in the United States District Court for District of Massachusetts, entitled Dinsdale et al v. Castlepoint Mortgage et al, seeking to recover unpaid overtime on behalf of Castlepoint Mortgage "loan officers" that routinely work 50, 60 and 70 hours per week. The lawsuit charges that Castlepoint Mortgage violated Federal Law by deliberately failing to pay overtime wages as required by the Fair Labor Standards Act ("FLSA").

Under the FLSA, employees are entitled to time-and-a-half pay for each hour over 40 hours worked in a workweek, unless they are exempt from the Act. The FLSA stipulates that employers do not have to pay overtime to higher level workers in executive, administrative and professional jobs.

However, the mere fact that an employee is given a title, classified by an employer as exempt and paid on a salary basis does not automatically remove that employee from the protection of the FLSA. Rather, determinative factors include whether the primary duties and responsibilities of the employee comply with applicable federal standards and are commonly associated with management.

**Furthermore, the United States Department of Labor has already issued two opinion letters that specifically categorize "loan officers" as entitled to overtime.**

In this case, Plaintiffs allege that Castlepoint Mortgage loan officers were required to work in excess of 50 hours per week and were paid a minimal base salary. Plaintiffs also allege that these employees spent most of their 50 hour plus workweeks engaged in non-managerial duties and that they have not been properly compensated for overtime.

"We wanted to file this lawsuit now to ensure that the hundreds of employees we believe were improperly denied overtime by Castlepoint Mortgage receive fair compensation for the all the long weeks they worked 50, 60, 70 and sometimes 80 hours", stated Erik H. Langeland, attorney for the Plaintiffs. Plaintiffs allege that this lawsuit may apply to hundreds of loan officers employed by Castlepoint Mortgage across the United States.

Our primary goals of this class action are to:

- prohibit Castlepoint Mortgage from failing or refusing to pay overtime wages to "loan officers"

HUR

prese
YOU
RIGH

click h
to find ou

- recover lost overtime wages and other just damages for loan officers who were denied overtime; and
- prevent Castlepoint Mortgage from denying overtime wages in the future.

If you are currently employed, or have been employed in the past three years, by Castlepoint Mortgage as a loan officer, and would like more information concerning your legal rights, we encourage you to contact an attorney at Touhy & Touhy, Ltd., or visit www.castlepointmortgageclassaction.com for more information.

## To participate in this class action, print out the Opt-in Consent Form,
### sign it and mail it to the address indicated before time expires.



A website service of Tou

Castle Point Mortage Class Action Alert

Page 1 of 1



Home | Updates | In The News | Court Rulings | Case Law | Opt-in | FAQ | Conta

CASTLE POINT MORTGAGE  Overtime Class Action Update

# Relevant Cases

### United States Department of Labor Opinion Letters

May 17, 1999. FLSA Opinion Letter from Daniel F. Sweeney, Office of Enforcement Policy Fair Labor Standards Team.

February 16, 2001. FLSA Opinion Letter from Barbara R. Relerford, Office of Enforcement Policy.



**To participate in this class action, print out the Opt-in Consent Form, sign it and mail it to the address indicated before time expires.**





A website service of Touhy

Home | Updates | In The News | Court Rulings | Case Law | Opt-in | FAQ | Conta

## Class Action Alert

click her
Freque
Aske
Questi

CASTLE POINT
MORTGAGE | **Overtime Class Action Update**

# FAQs

What is the Fair Labor Standards Act (FLSA)?
What is this lawsuit all about?
Who is covered by this lawsuit?
How can I join this lawsuit?
What relief is being sought by the Plaintiffs?
Are there any time limitations?
What happens if you do not join this lawsuit?
What are some general FLSA principles?
How is overtime calculated?
How do employees prove overtime hours worked?



get your
**LOST
WAGES**
click here
to find out how

### What is the Fair Labor Standards Act (FLSA)?
The Fair Labor Standards Act is a federal law that requires employers to pay overtime compensation to most employees at a rate of one and one-half (1½) times their regular rate for ever hour they work in excess of 40 hours per week.

### What is this lawsuit all about?
The individuals who filed this lawsuit (Plaintiffs) claim that they and other "Loan Officers" who were employed by Castle Point Mortgage and shared similar duties, were denied overtime compensation for hours they worked in excess of forty (40) hours per week. Plaintiffs allege that Castle Point Mortgage violated the federal Fair Labor Standards Act of 1938 (FLSA) when they misclassified "Loan Officers" as exempt from the FLSA and failed to pay them overtime compensation for hours worked in excess of forty (40) per week. If you worked for Castle Point Mortgage as a "Loan Officer" at any time within the past three (3) years, you may qualify as a class member and have the right to join this lawsuit.

### Who is covered by this lawsuit?
The named Plaintiffs seek to sue on behalf of themselves and also on behalf of other employees with whom they are similarly situated.
Specifically, the named Plaintiffs seek to sue on behalf of any employees who are or have been at any time within the past three (3) years employed at Castle Point Mortgage as "Loan Officers" and who have not already had their claims for overtime previously adjudicated.

### How can I join this lawsuit?
Although this lawsuit was filed as a collective action on your behalf, **you cannot participate in this lawsuit unless you consent in writing to join the lawsuit as an opt-in member.** If you fit the definition above, you may join this suit (that is, you may "opt in") by mailing the Opt-in Consent form to Plaintiffs' counsel at the following address:

Attn: Castle Point Mortgage Class Action
Touhy & Touhy, Ltd.
161 North Clark Street
Suite 2210
Chicago, Illinois 60601
www.castlepointmortgageclassaction.com

This form must be returned in sufficient time to have Plaintiffs' counsel file it with the federal court. If

Castle Point Mortage Class Action Alert

you fail to return the Opt-in Consent form to Plaintiffs' counsel in time for it to be filed with the federal court on or before the above deadline date, you may not be able to participate in this lawsuit.

If you file an Opt-in Consent form, your continued right to participate in this suit may depend upon a later decision by the District Court that you and Plaintiffs are actually "similarly situated" in accordance with federal law.

## What relief is being sought by the Plaintiffs?

Plaintiffs seek to recover unpaid overtime compensation, including the interest thereon, statutory penalties, reasonable attorneys' fees and litigation costs on behalf of themselves and all similarly situated current and former "Loan Officers".

## Are there any time limitations?

YES. There is a two (2) year deadline for filing overtime claims (or three (3) years if the violation was willful) running from the date(s) the overtime hours were actually worked. You have multiple deadlines if you worked overtime on multiple occasions. To maximize your recovery, return your Opt-in Consent Form as soon as possible so we may file it with the Court and preserve your rights.

## What happens if you do not join this lawsuit?

If you chose not to opt-in and join this lawsuit, you will not be affected by any judgment or settlement, either favorable or unfavorable, in this action. The only other way for you to recover lost overtime pay is if you timely file your own lawsuit and prevail on your claims. The FLSA requires that any claims for overtime compensation be filed in state or federal court within two (2) years (or within three (3) years if the violation was willful) of the time that the overtime was worked. Any claims for overtime pay not filed within these time limits are likely to be denied as late.

## What are some general FLSA principles?

There are a few well-established principles regarding exemptions to the Act:

1. Employees are presumed to be entitled to overtime pay;
2. The employer bears the burden of proving that an employee fits within a claimed exemption;
3. Job duties, not job titles govern whether an exemption applies. Employers often give employees fancy administrative titles (such as "Loan Officers") for the purpose of exempting them from overtime pay. Legally, this is not allowed. In determining whether an exemption applies, an employee's actual job duties must be evaluated;
4. Exemption to overtime pay are narrowly construed against the employer. If there is reasonable doubt as to whether an exemption applies, the balance swings in favor of the employee who should receive overtime compensation.

## How is overtime calculated?

For each hour of overtime worked, an employee must be paid one and one-half (1½) times the employee's regular rate of pay. The regular rate of pay may equal an employee's hourly rate of pay, but it may also include other work related payments such as shift differentials, bonuses, longevity pay and educational incentive pay etc. In cases where the employee is paid a salary, as is the case here, the regular rate of pay is determined by the employee's hourly equivalent plus bonuses and other work related payments.

## How do employees prove overtime hours worked?

The FLSA requires employers (Castle Point Mortgage) to keep accurate payroll records of employees' work hours and the amounts paid to them. This is true even for employees who the employer excludes from overtime compensation. If an employer fails to maintain records, the courts rely on employees' reasonable estimates of their work time through their testimony or written documentation.

## To participate in this class action, print out the Opt-in Consent Form, sign it and mail it to the address indicated before time expires.





A website service of Touhy