UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL REINSMITH and KEVIN DINSDALE,   )
Individually, and on Behalf of all Others    )
Similarly Situated,                          )     C.A. No. 05 11168 GAO
                                   )
    Plaintiffs,                       )
                                   )
v.                                    )
                                   )
CASTLE POINT MORTGAGE, INC.,        )
                                   )
    Defendant.                      )

## AFFIDAVIT OF CHRISTOPHER INFANTINO

I, Christopher Infantino, hereby state, under oath, as follows:

1.    I am a Vice President, Secretary, and part owner of Castle Point Mortgage, Inc. I have held this position since July, 2002 and work out of Castle Point's Elkridge, Maryland, office.

### Communications with Current Employees Regarding this Lawsuit

2.    Every six months Castle Point has a meeting with managers to review ongoing business operations, future plans for the company and challenges that the company is facing.

3.    One of those semi-annual meetings was held on July 14, 2005 at the Crown Plaza Hotel in New York City. Jason Lewis attended this meeting as did ten other sales managers, the Director of Sales and the executive team, which consists of Gerald Infantino, Steven Vanderbilt, William Dierker, Douglas Hanke, and me.

4.    As part of the discussion concerning challenges that the company was facing, Steven Vanderbilt identified two lawsuits – this lawsuit and a Maryland wrongful discharge action – that had been served on the company within the previous month. Castle Point had

received service of the complaint in this matter on June 30, 2005, approximately two weeks before the July meeting.

5.    With respect to this lawsuit, Mr. Vanderbilt stated that the lawsuit was brought by two former loan officers from the Massachusetts area who were claiming that they were owed overtime for hours worked in excess of forty hours per week. He said that because we believed that we had correctly classified the employees as exempt and that the loan officers generally did not work over forty hours per week, we thought that we would win the lawsuit. He added that at some point, notice would be sent out to all loan officers who could be part of the lawsuit about their ability to join the lawsuit.

6.    With respect to the wrongful termination lawsuit, I stated that the former employee was seeking approximately $1.2 million in damages.

7.    Mr. Vanderbilt also communicated to the managers that our philosophy with respect to these lawsuits was to defend ourselves when we believed we had done nothing wrong because we feared that if we settled meritless lawsuits without proffering a defense, we would be perceived as an easy financial target.

8.    After my and Mr. Vanderbilt's statements, one of the sales managers asked if they could tell the loan officers who reported to them not to join this lawsuit. Mr. Vanderbilt told the group they could absolutely not do that and that it was up to each loan officer to decide whether to join the lawsuit. Mr. Vanderbilt further instructed the sales managers that their conduct and statements were attributable to the company, and that if they tried to dissuade a loan officer from joining the lawsuit, that was the same as if the company had done so. His overall instruction to the sales managers was not to discuss the FLSA lawsuit with the loan officers.

9.    I also emphasized that there would be no retaliation against any employee who joined the lawsuit.

10.    Another sales manager asked how many hours per week the loan officers claimed to be working. I said as much as 50, 60 and 70 hours per week. The response from the sales managers was that none of the loan officers were working that many hours. There was also a question about which loan officers had brought the lawsuit and I stated that it was Paul Reinsmith and Kevin Dinsdale.

11.    The discussion of the lawsuits lasted approximately five minutes during the course of an approximately four-hour meeting.

12.    Neither Steve Vanderbilt nor I said during the meeting that this lawsuit was brought by two "disgruntled" former employees for the purpose of "getting even" with Castle Point, or that they had "twisted" an "old law" for their wrongful purposes.

13.    I did not state that we had more financial resources than anyone who could sue us. Indeed, it was my understanding at the time that lawsuits by employees against their current or former employer are often brought on a contingency basis so the financial resources of the employee are not an issue.

14.    After the meeting, two sales managers, Chad Jones and Brian Krolcyk, asked me if they could pull loan officers aside to tell them not to join the lawsuit. I reiterated Mr. Vanderbilt's earlier comments and told them that they absolutely could not do this. I further told them that if they thought they would be helping Castle Point by doing this, they were wrong because they would in fact be hurting the company. Mr. Vanderbilt was either present for this conversation or I told him about it after the fact.

15.    In October, 2005, we had meetings with the loan officers in each of Castle Point's three offices – Massachusetts, New Jersey and Maryland – about a change in policy concerning work hours. The new policy, to be implemented October 23, 2005, firmly limited loan officers to 40 hours per week and required loan officers to submit time sheets each week. In the context of introducing the policy, we explained that Castle Point had been sued by two former loan officers seeking overtime pay and that while we believed we had complied with the law, we were changing Castle Point's policy to remove any possible question on the issue.

16.    Chris Peel, New Jersey Center Manager, and Gerald Infantino, President, communicated the message on the change in policy in person to the New Jersey office; Steve Vanderbilt and I communicated the change in policy in person to the Maryland office; and Charles Easter, Center Manager for Massachusetts and Maryland communicated the message to the Massachusetts office by telephone.

17.    The points we were to communicate on the change in policy are attached as Exhibit A. In my communication with the Maryland office, there was no discussion of this lawsuit other than as mentioned in the attached document. On information and belief, that is true of the communications with the Massachusetts and New Jersey offices as well.

18.    In February, 2006, I learned that a notice was going to be sent to all current and former loan officers concerning their ability to join this lawsuit. We have a practice within Castle Point of openly communicating with our employees about major issues within the company. I thought failing to acknowledge the notices that the employees were receiving directly to the employees would be inconsistent with this practice and, given its inconsistency, could cause employees to question the overall financial viability of the company.

- 4 -

19.     Accordingly, Gerald Infantino, Steve Vanderbilt and I decided that a short message should be communicated to the current loan officers about the notice that they would be receiving.

20.     Charles Easter spoke with Loan Officers who had transferred from Loan Officer positions to operations positions and Bryan Krolcyk, Luis Falcon, Erin Triplett and Kristie Varga each spoke with the Loan Officers who reported to them. All were instructed to deliver the message attached as Exhibit B, answer any questions, and end the meeting. My understanding is that there were few, if any, questions posed by the loan officers and that the meetings in which the messages were delivered lasted only a few minutes.

21.     The above communications are the only substantial communications that have occurred from Castle Point's Executive Team to its loan officers regarding this lawsuit.

22.     I am aware that state court complaints have been brought against certain former loan officers for violation of their Loan Officer Confidentiality, Non-Competition and Non-Solicitation Agreements. I have not discussed these state court lawsuits with Castle Point employees other than Castle Point's executive team.

23.     Attached as Exhibit C, is a copy of our Employee Communications Policy, which asks employees who have a job related issue to first generally seek to address the issue with their supervisor, and if that is unsuccessful, to then contact Human Resources, Gerald Infantino, Steve Vanderbilt, or me directly. No employees have come to me with concerns about possible retaliation as a result of opting in to this lawsuit, nor have any employee concerns about possible retaliation been brought to me by others.

Sarah Biehl

24.    Sarah Biehl was employed by Castle Point as a loan officer from November 21, 2005 until February 28, 2006.

25.    Loan officers receive internet based leads to pursue for mortgages. Leads are divided into two categories: Lending Tree leads and non-Lending Tree leads. Lending Tree leads are generally higher quality and result in more closed mortgage transactions. All new loan officers start on non-Lending Tree leads. Within the two groups of leads, there is no difference in the quality or number of leads that loan officers receive. Within each group, loan officers receive leads on a random basis.

26.    Approximately every four weeks, loan officer assignments to the two groups of lead sources are re-evaluated based on the loan officers' conversion rates for the previous four weeks. Conversion rates are determined by dividing the number of closed transactions by the total number of leads received. The loan officers with the highest conversion rates are assigned Lending Tree leads and the other loan officers are assigned to non-Lending Tree leads.

27.    Ms. Biehl reached a high level of performance fairly quickly and as of January 27, 2006, she was assigned to Lending Tree leads.

28.    On approximately February 17, 2004, Ms. Biehl came to me, crying. She told me that she loved the company but was going to have to quit because she could not wait until her commissions became payable. She said she needed additional money at once to pay bills and was going to work full-time as a hairdresser rather than continue to work at Castle Point. At the time, Castle Point was paying her a salary of $2,000 per month.

29.    I had been impressed with Ms. Biehl's performance so far at Castle Point and told her that I thought she had a good future at Castle Point. I told her that if it was purely a financial

issue, Castle Point could advance her funds based on her future commissions which we would then deduct from her later commission payments over a few-month period. Ms. Biehl said that this would "make life easier for her" and gave me a hug before leaving my office.

30.     I then spoke with Erin Triplett, Ms. Biehl's manager, and Charles Easter, Ms. Triplett's manager, about the situation. I told them to work out an arrangement with Human Resources and Mr. Vanderbilt to advance Ms. Biehl between $1,000 and $3,000 on her future commissions.

31.     Ms. Biehl received an advance of $2,165.94 on approximately Monday, February 20, 2006. A copy of the check for this amount is attached as Exhibit D. Based on the mark, 'Phila PA 2212006', indicating the date the check cleared, I believe Ms. Biehl cashed the check, on or about the day she received it, February 20, 2006.

32.     Within a week, I received a call from Charles Easter. Mr. Easter told me that there was a Castle Point loan officer, Joanna Rensch, whose fiancé's brother worked at Ameriquest Mortgage Co. The fiancé's brother told Ms. Rensch that Ms. Biehl was interviewing and asked Ms. Rensch what she knew about Ms. Biehl. Ms. Rensch informed her manager, Ms. Triplett, that Ms. Biehl was interviewing with a competitor, who then informed Mr. Easter. Mr. Easter told me that he planned to discharge Ms. Biehl. This is consistent with Castle Point's practice of discharging any employee who we learn is interviewing for positions outside Castle Point.

33.     Ms. Triplett and Mr. Easter met with Ms. Biehl to inform her of her discharge on February 28, 2006. It is my understanding that Ms. Biehl admitted that she had interviewed for a position at Ameriquest during this meeting and that Ms. Biehl was told that she was being discharged because she was interviewing with a competitor.

34.    Ms. Biehl has not repaid the $2,165.94 advance she received from Castle Point.

<u>Plaintiffs' Communications Concerning this Lawsuit</u>

35.    Attached as Exhibit E is an email forwarded to me by Charles Easter, attaching what appears to be a October 21, 2005 mass email from plaintiffs' counsel concerning this lawsuit. Mr. Easter received the email from Marc Tucci who worked with me at Champion Mortgage before I began working at Castle Point.

Signed under the penalties of perjury, this 11th day of April, 2005.


Christopher Infantino

1518422.1

EXHIBIT A

## Timesheet Roll out

**What:** Rolling out maximum 40 hour work week for sales force

**Why:** There are laws regulating the number of hours employees may work per week and whether employees are entitled to overtime for hours worked in excess of 40 hours per week. While we believe that we have complied with the law in the past, these new procedures will remove any possible ambiguity. As you may know, two former loan officers have filed suit against the company contending that we owe overtime pay. Again, while we believe that we have complied with the law, going forward, we wish to remove the possibility of any doubt or future lawsuits based on this issue.

## What the employees need to be told:

There will no change to your current job function. With your help, we'll keep track of your hours and breaks, to insure that your weekly hours do not exceed 40.

Each loan officer will be responsible for submitting a timesheet directly to HR every Monday.

Your breaks are your time to use as you see fit, so long as you are not engaged in work on behalf of the company.

Your time records must be accurate

You will have a timesheet to complete by Monday 9:30 am. Timesheets will be submitted directly to payroll.

EXHIBIT B

Manager communication regarding opt-in notices

  As you might recall back in October, we announced to you that two former loan officers from our Massachusetts office had filed a lawsuit in Massachusetts contending that loan officers were entitled to overtime pay. In connection with that lawsuit, you will be receiving a notice from the loan officers' lawyers about the lawsuit and how to join the lawsuit if you decide to do so.

Castle Point has always, and continues to maintain that loan officers are exempt from overtime and we believe that we've always treated employees fairly. While we feel that the lawsuit is without merit and that we'll successfully defend the lawsuit, we must go through the process.

If keeping with our commitment to open communication we are making our loan officers aware of the impending notices to prevent confusion and unnecessary concern. The decision about whether to participate in the lawsuit is up to each of you. There will be no retaliation by Castle Point should you decide to participate in the lawsuit.

EXHIBIT C



# Castle Point Mortgage, Inc Employee Handbook

CP0569

# III. WORK PRACTICES

## *Employee Communications*

Communication is the key to a successful team. In that spirit, Castle Point will make sure the lines of communication in the Company stay open. Here are some of the tools we'll use to do that:

### Staff Meetings

Castle Point will have regular staff meetings. Some of these meetings may be mandatory. These informative gatherings will allow employees to learn about recent company activities and changes in the workplace. The meetings will also allow the Company to recognize outstanding employee efforts.

### Handling Complaints

Under normal working conditions, employees who have a job-related problem, question, or complaint should first discuss it with their immediate supervisor. This is how employees can usually reach the simplest, quickest, and most satisfactory solution. If the employee and supervisor are unable to resolve the issue, Castle Point encourages employees to contact Chris or Gerald Infantino directly.

CP0592

EXHIBIT D



6831

**CASTLE POINT**

CASTLE POINT MORTGAGE, INC.
7 ENTIN ROAD
PARSIPPANY, NEW JERSEY 07054-3029
(800) 840-1035  EXT. 435 DX. 419

WACHOVIA

65-320/550

2/17/2006

PAY
TO THE
ORDER OF    Sarah Biehl

$ **2,165.94

Two Thousand One Hundred Sixty-Five and 94/100****************************************************  DOLLARS

Sarah Biehl

MEMO    Advance

AUTHORIZED SIGNATURE

⑈006831⑈ ⑈055003201⑈20000102633385⑈ ⑈000021659⑈

EXHIBIT E

**From:** Marc Tucci [mailto:tucci7@gmail.com]
**Sent:** Friday, October 21, 2005 4:42 PM
**To:** Chuck Easter
**Subject:** Fwd: Overtime Update from Touhy & Touhy, Ltd.

you guys getting sued for this?
how was last night?

---------- Forwarded message ----------
From: **Ada Hooten** <ahooten@touhylaw.com>
Date: Oct 21, 2005 12:07 PM
Subject: Overtime Update from Touhy & Touhy, Ltd.
To: lawyers@touhylaw.com

# ***OVERTIME UPDATE***

We are writing to inform you that we are investigating and pursuing claims for unpaid overtime on behalf of loan officers across the country.

Under the Fair Labor Standards Act "FLSA", loan officers who originate loans, process loans or close loans as their primary duty may be entitled to overtime for hours worked in excess of 40 per week.

The United States Department of Labor "DOL" has issued two opinion letters that specifically categorize loan officers as non-exempt from the FLSA. In its opinion letters, the DOL concluded that loan officers who carry out their employer's day-to-day activities (production work) rather than exercise discretion in determining the employer's course of business (policy work) are entitled to overtime pay.

Currently, we are pursuing claims for unpaid overtime on behalf of loan officers in the following cases:

- Chemi et al v. Champion Mortgage et al (championmortgageclassaction.com);

- Reinsmith et al v. Castlepoint Mortgage (castlepointmortgageclassaction.com);

- Flynn et al v. Mortgage IT et al (mortgageitclassaction.com);

- Perez et al v. Wells Fargo (wellsfargoclassaction.com – under construction); and,

- Armstrong et al v. Weichert Financial et al (weichertclassaction.com – under construction).

If you or someone you know worked for one of the above mentioned employers **(and have not already opted in to one of the above listed cases)** or worked more than 40 hours per week as a loan officer and were not paid overtime by another employer, we encourage you to contact an attorney at Touhy & Touhy, Ltd., for more information.

Sincerely,

Touhy & Touhy, Ltd.
161 North Clark Street
Suite 2210
Chicago, Illinois 60601
Phone: (312) 372-2209
Facsimile (312) 456-3838
Email: lawyers@touhylaw.com
Web: touhylaw.com